## CONNER, Ford's Ad., et al. vs. ABBOTT.

| 35 | 365 |
|----|-----|
| 58 | 486 |
| 35 | 365 |
| f66 | 116 |
| 66 | 117 |

1. MORTGAGE: *Acknowledgment: The word "consideration" essential.*

   If the acknowledgment of the execution of a mortgage fails to state that the mortgage was executed for the "consideration" therein expressed, it is insufficient, and the mortgage, though recorded, is void against subsequent purchasers, even with notice; but is good between the parties to it.

2. MARRIED WOMEN: *Note and mortgage of, void, unless, etc.: Protected in chancery without defense.*

   A promissory note of a married woman not given for her personal benefit or that of her separate property, is void. And so is her mortgage in which her husband has not joined, and which has been acknowledged by her as a *femme sole*, and not as a married woman. And in a suit to foreclose such mortgage, a court of equity will protect her, though she make no defense against it. In such cases, it is the duty of the Chancellor to examine her in open court, in regard to her wishes, and to see that her assent is intelligently and freely given, before making any decree other than would be made against her *in invitum*. And wherever, upon appeal, this practice appears to have been omitted by the Chancellor, and she has not disposed of her rights by the statutory method, this court should, of its own motion, extend the protection which the law intends to afford. But such decree against her is not void, but good until reversed.

   [The mortgage in this case was executed before the adoption of the constitution of 1874. REP.]

Conner, Ford's Ad., et al. vs. Abbott.

3. STOCKHOLDERS:   *When partners.*

When parties become stockholders in a company for the purpose of organ-
izing a corporation under the laws of the state, and engage in the busi-
ness for which the company was formed, but fail to complete the incor-
poration of the company by filing the articles of incorporation in the
office of the secretary of state, they become partners with interests pro-
portionate to their shares, and can take property, in equity, for partner-
ship purposes.

APPEAL from *Randolph* Circuit Court in Chancery.
Hon. L. L. MACK, Circuit Judge.
*Yonley & Whipple,* for appellants.
*Henderson & Caruth, contra.*

EAKIN, J.   On the nineteenth of August, 1874, appellee,
Abbott, filed this bill against James H. Ford and wife,
Willoughby Conner and wife, and James T. Martin and
his wife, Kate A. Martin, to foreclose a mortgage made to
secure a note to complainant for $4,000 by said Ford, Con-
ner and Kate A. Martin, dated February 4, 1873, and pay-
able at twelve months, with interest at the rate of 24 per
cent. per annum from date until paid.

The mortgage was upon a body of lands in said county
of 680 acres, and was signed by said Ford and Conner, with
their wives, and by Kate A. Martin.   It was acknowledged
by all the parties grantors, but said Kate A., both in the
execution and acknowledgment, acted as a *femme sole,* no
mention being made, in the face of the instruments, of her
coverture.   Questions are raised in argument of the suffi-
ciency of the acknowledgment of Ford, and of his wife
and Conner's, which will be noticed hereafter.   The bill
states that said James T. Martin *is* the husband of said
Kate A., but does not disclose when he became so.   It

Conner, Ford's Ad., et· al·. vs. Abbott.

seems, from the evidence, however, that she was married at the time.

Complainant claims to be in possession; acknowledges a payment of $200 and prays foreclosure of the balance.

Conner and Martin, with their wives, answer, admitting the execution of the mortgage. They deny complainant's possession, but say that he holds under and by authority of a certain company known as the "*Fourche Manufacturing company*," to which the property in question had been conveyed by Ford and wife, with· complainant's consent. They set forth the names of those composing the company, and say that they purchased the premises from Webb, Conner & Co. for $16,000, upon condition that said firm would procure a deed to the company, of the lands, from Ford and wife, who had sold to Conner & Co., but then had made no deed. The articles of association of the company, entered into on the first day of March, 1874, are exhibited, which recite the purchase from Webb, Conner & Co., of 440 acres of the land, for the purposes of the company, for $1,600. A deed was accordingly executed to the company on the 14th of May, 1874; by Ford and his wife, and respondents say, the company has been, ever since, in possession, and is a necessary party to this proceeding. They say further that when the purchase from Ford was made, and his deed taken, complainant agreed with Webb, Conner & Co. to take $2,500 of stock in the company, and to receive a stock certificate for that amount; and also, as collateral security in part payment of the note, another stock certificate from Conner & Co., for the sum of $6,000; and further, said firm was to pay him $500 in cash; all of which was to be in consideration of a release of the mortgage upon the mortgaged lands, which he agreed to make on those terms.

They allege that certificates of stock were issued to all subscribers who had paid' up their stock, and that complainant, in part payment of his mortgage, received a certificate of $2,500 in stock, and that Webb, Conner & Co. tendered to him another certificate of $6,000, to be held as collateral, for further satisfaction of the mortgage, which tender had been kept good, and the stock offered in court with the answer; and that the sum of $500 was covered by an account of said firm against said complainant, due before the commencement of the suit.

They ask, therefore, that the mortgage be canceled, and that complainant be held to a specific performance of his agreement, and that an account be stated, and for further relief.

The articles exhibited provide for the formation of a joint stock company, under the laws of the state, with a capital of $26,000, to be divided into shares of $100 each. The names of the subscribers are given, with the amount of stock taken by each, ranging in sums from $100 to $10,000, amongst which appears the name of complainant for twenty-five shares, amounting to $2,500. They number, in all, forty-one subscribers. The articles were filed with the clerk of the county, but not with the secretary of state.

Ford and wife answer, and admit the execution of the mortgage, but deny complainant's possession. They allege their sale made to Conner & Co., and the execution of the deed, by Conner & Co.'s directions, to the "Fourche Manufacturing company," which they say was by complainant's consent. They set forth the names of all who composed the company, including that of complainant, and say that he induced the company to accept, and respondents to make, the deed, by the express understanding that he would release his mortgage, thereby causing the com-

pany to organize and issue certificates of shares for paid-up stock. They repeat the allegations of Conner and Martin, and sustain the same as to the circumstances and agreement under which the land was conveyed to the company. They allege that the company was organized, and that complainant acted as a director, and accepted the office of treasurer and served the company for several months as such, at a salary of $50 per month.

They claim that he is thus estopped from proceeding to foreclose his mortgage. They make their answer a cross-complaint, stating that said Ford was seized of the lands in fee simple, in February, 1873, and sold the same by title-bond to Conner and wife, and Kate A. Martin and her husband, for $6,000, to be paid in yearly installments.

There was a mill upon the land, and for the sake of making costly improvements, he afterwards joined the vendees in making the mortgage. In the spring of 1874, Conner informed him that he was insolvent and could not pay the mortgage, nor could Kate A. Martin, and induced him to make a deed of it to the company about to be organized for manufacturing and trading purposes, and to take stock from Conner for what should be due him from said Conner and Kate A. Martin on the land. At the same time he had been advised by Conner that complainant would take stock upon his mortgage to the extent of $2,500, and $6,000 more from Conner as security, and a payment of $500, and would release his mortgage.

Ford further sets forth the agreement to form the manufacturing company and the intention to incorporate themselves under the law, which intention failed by mistake in fixing the value of the shares.

He says, however, that the company is proceeding to transact a general business without having filed the neces-

sary documents with the secretary of state, and are using the premises which he sold to them. That he sold in good faith and joined in the company, under the belief that Abbott, the complainant, would release his mortgage, and the company would hold the property free from incumbrances—all parties taking stock for their several interests.

He alleges that the company has a large amount of various kinds of assets on hand; that the officers are receiving large salaries, and that now said complainant, contrary to his agreement and understanding, is endeavoring to. foreclose the mortgage.

He makes all the other members of the association parties defendant to the cross-bill, and prays that the articles be reformed in accordance with law, and that the president and board be compelled to file them with the secretary of state and county clerk, so as to constitute a valid joint-stock company, before proceeding further in business, and that Abbott and Conner be compelled specifically to perform their agreements, and for general relief.

Upon motion, a summons was issued for all the subscribers made defendants, and, by consent, Willoughby Conner, one of the parties to the suit, was appointed receiver.

Complainant answered the cross-bill, admitting Ford's seizin in fee as alleged, but denying that he ever offered him any inducement to execute the deed to the company, or authorized Conner or any one else to say to Ford that if he would execute it the mortgage would be released. He denies that he agreed to cancel it upon the terms alleged; but admits that, being misled to believe the company had been duly organized according to law, he, under that impression, did make the agreement with Conner, upon con-

Conner, Ford's Ad., et al. vs. Abbott.

dition that the latter would pay him $500 in cash, and the company would issue to him $2,500 in paid stock, and in addition thereto, that Conner would deliver up to him $6,000 in paid certificates, to be held by him as collateral for his mortgage debt, which was still, however, to remain as a lien on the property; and if the subscribers would all pay promptly their installments. But he says there was no legal corporation, nor agreement to bind the subscribers to a mercantile partnership. He denies that Conner ever paid or tendered him the sum of $500, or that any of the conditions were performed upon which he was to release the mortgage. The company was never organized; many of the subscribers have withdrawn—refusing to pay up their stock, and taking no further interest in it. He admits that he acted as director and treasurer, and was paid a salary for his services as miller, during three or four months.

Levi Hecht, one of the subscribers, holding paid up stock to the value of $1,000, answered the bill. He positively asserts the agreement of complainant, Abbott, upon the formation of the company, to take the shares as alleged, and release the mortgage. He prays for an account between those holding paid up stock.

The firm of Surridge & Fisher, also holders of paid up stock to the value of $1,000, answer, and assert an express agreement between Abbott and the other subscribers for the release of the mortgage, on the purchase of the lands by the company. They pray the same relief with Hecht.

The decree was made, on hearing, for Abbott, for a foreclosure of the original mortgage, with a money decree for the debt against the administrator of Ford, who had died pending the suit, and Conner, and said Kate A. Martin.

The amount found due was $8,404.44, for the payment of which a sale was ordered, and execution for any balance

Conner, Ford's Ad., et al. vs. Abbott.

which the sale might fail to satisfy. The cross-bill of Ford and wife was dismissed.

All the defendants appealed.

1. ACKNOW-
LEDGMENT:
The word
"consider-
ation," es-
sential in.
A review of the pleadings·and voluminous testimony, leads our minds to the following conclusions of fact: The land in question was a valuable tract belonging to Ford in fee simple. There was a mill upon it with valuable ma· chinery. Ford sold by title-bond to Conner and Kate A. Martin, a *femme covert*, but made no deed. They required more means than they had to work the place successfully, and Ford joined with them in the execution of a note to Abbott to borrow money for the purpose; and, to secure it, the mortgage in question was made. As to Kate A.

2. MARRIED
WOMAN:
Note and
mortgage
of, when
void. Pro-
tected in
chancery
withoutde-
fense.
Martin, it is apparent that both the note and mortgage were absolutely void. She executed both, and acknowl- edged the latter as a *femme sole*. This she was incompe- tent to do. The note does not purport, nor does any proof show it, to have been executed for the benefit of herself, personally, or her separate property. Her husband does not join with her in the mortgage, nor does she acknowledge it under privy examination. She is sued with her husband, and neither of them set up these mat- ters in defense, but they were brought to the notice of the Chancellor by the record. There is no doubt of the power of courts of chancery to make binding decrees with re- gard to the rights of all parties before it, whether *sui juris* or not, and these decrees must, in all collateral proceed- ings, be respected. But the practice in chancery should be in aid of that fixed or inflexible policy of the law which protects married women from alienations of their prop- erty under compulsion or undue influence of their hus- bands. That policy might be entirely defeated if the alienation should be accomplished by making mar-

Conner, Ford's Ad., et al. vs. Abbott.

ried women parties to a suit with their husbands, and transferring their property by decree, on failure of defense. They do not conduct suits in person, or usually employ separate attorneys. Compulsion or undue influence might be quite effectual to prevent that. It is the common practice in England, in dealing with the rights of married women, to examine them personally in court with regard to their wishes, and to see that their assent is freely and intelligently given, before any decree is made, other than such as would be rendered against them *in invitum*.

This practice is the only safe one for our Chancellors, and wherever upon appeal it appears to have been omitted, and they have not disposed of their rights by the statutory method, this court, in its superintending control, has and should exercise the power of its own motion, of extending the protection which the law intends to afford. There may be peculiar circumstances making exceptional cases, but none such here appears. This court has gone far in the support of the policy of the law, in holding that a married woman can not estop herself by any matter *in pais* from claiming her rights in real estate; and it is but a reassertion of the same principle to hold it error in a Chancellor to divest them upon her mere failure to assert them, without a privy examination, or something equivalent. We do not mean to be understood as saying that such decrees are void—the court having jurisdiction of the persons and subject-matter. They are good until reversed, as all decrees within the jurisdiction are. Nor do we mean to say that courts of chancery may not, by decree, transmit, alter or affect the rights of married women in property not previously conveyed as the statute requires. But in doing so, the Chancellor should take care that her wishes are ascertained, and that she freely and voluntarily

assents to the same without compulsion or undue influence. Where this is not done, and there has been no legal conveyance, the Chancellor should leave her rights as he found them, although she may be, herself, passive in the suit. No decree at all should have been rendered against Kate A. Martin, binding her or her property.

The acknowledgment of Ford is defective. It fails in stating that the mortgage was executed for the " consideration " therein set forth. This would render the mortgage void against subsequent purchasers, even with notice, but leaves it good against himself and Conner, who were parties. This made it sufficiently valuable to support a contract for a release, if any were made, or to form the subject of an equitable estoppel; or if there were no estoppel, to support a suit for foreclosure against such of the makers as cou'd act *sui juris*, and subsequent purchasers failing to set up a defense.

Under this condition of affairs, it appears that the several mortgagors, together with Abbott, the mortgagee, and others to the number, in all, of forty-one, agreed to form a joint stock company, for manufacturing and trading purposes, under the general laws of the state, and thus constituting a corporation or body politic; and to purchase a large portion of the land in question as the basis of their operations. They seem, in good faith, to have endeavored to perfect their organization.. Articles were drawn and signed with the names of the subscribers, and the amount and value of stock taken by each, and the articles were filed with the clerk of the county.

There had been reluctance and hesitation, however, on the part of many of the subscribers, to engage in the enterprise whilst the mortgage of Abbott was hanging over the land, by which it might, at any time be taken, or the

company be compelled to sink its capital in redeeming. Abbott, at the time, seems to have favored the enterprise, and authorized Conner to make it known that he was willing to take upon his debt $2,500 of paid-up stock in payment, and $6,000 of like stock to be placed in his hands by Conner as collateral for the balance, and $500 from Conner to be paid in money, and, that being done, to release to the company his lien upon the land. Abbott, it is true, denies some of this, and insists that there were still other conditions; but making due allowances for difference in memories, we rest upon the conclusion that this statement embraces all the material points of what he meant that his contemplated associates should understand. With this understanding the difficulty was removed, and the organization proceeded. A board of directors was elected, of which Abbott was one. He was also made treasurer, and served the company as miller, for three months, drawing a salary. Meanwhile, he seems to have become dissatisfied. It is discovered that the articles are not in accordance with the law. The shares are fixed at $100 each, whilst the act requires they should be $25, and the articles have not been filed with the secretary of state. Abbott declines to execute the release, and many of the subscribers become discouraged and refuse to pay their calls. But the land had already been put in by the joint consent and act of all interested; and Ford, in whom the equity of redemption remained, had made a conveyance to the company. For the value, paid stock to the amount of $16,000 had been issued, of which Abbott received, individually, $2,500, as agreed, and the other owners, shares in proportion to their interests. Of the shares received by Conner, who seems to have been principal owner, $6,000 were tendered to Abbott for the security of his debt, and

some was assigned by Conner to those subscribers who were his creditors. Ford received about $3,000. The sum of $500 to be paid to Abbott was never tendered to him in cash, but it is shown that Conner had an account against him, which, if settled, would have more than covered the amount; and that Conner offered to settle in that way. Abbott testifies that it was a further condition that all the subscribers should pay their calls promptly, but he is not supported in this by the other witnesses who testify as to the agreement—all of whom, save Abbott, concur in saying that the corporation was formed and the purchase from Ford made under the impression derived from Abbott's acts and declarations, that the title to the land would be vested in the company, free of all incumbrances, in consideration of the conditions to be performed by Conner.

The doctrine of equitable estoppel is clearly marked, and so well defined in its grounds and principles that it is easily applied to any state of facts. It arises from conduct, and is independent of the statute of frauds.

No writing is essential to its operation. It has been easily formulated by text-writers. "It exists," says Justice Story, "where a man designedly and knowingly produces a false impression upon another, who is thereby drawn into some act or contract injurious to his own rights or interests (*Eq. Jur.*, sec. *384*), he will not be allowed to assert his rights afterwards, to the injury of the person so misled." And, further, he says (*ubi supra*): "If a man, having title to an estate, which is offered for sale, and, knowing his title, stands by and encourages the sale, and does not forbid it, and thereby another person is induced to purchase the estate, under the supposition that the title is good, the former, so standing by and being silent, will be bound by the sale, and neither he nor his privies will be at liberty to

dispute the validity of the purchase." "It embraces," says Mr. BISPHAM (See *Principles of Equity, sec. 287*), "all those numerous cases in which a party is prevented from asserting his title, because, by active encouragement, or equally effective silence, he has induced third parties to believe that no such title exists, and they have expended money, or in some way altered their position on the faith of such supposed non-existence." And further, as if *apropos* to this case in judgment, he says, "that one who allows his name to appear as a shareholder to induce others to take stock, is estopped from denying that he is such."

These are but illustrations of an all-pervading principle extending through every branch of equity jurisprudence which holds it fraudulent in any one to mislead another by acts, words or silence, when good faith and fair dealing require him to speak, to do acts or invest money, and then assert rights with regard to the subject-matter, which would be injurious to the person misled, and leave him in worse position than if he had never acted.

This rule applies clearly to estop Abbott from enforcing his mortgage against so much of the land as is embraced in the deed from Ford to the company.

He encouraged the formation of the company; held himself out as a subscriber of $2,500 of the stock; became a director, and the treasurer; received a salary; induced Ford to convey his equity of redemption to the company, and forego his claim against Conner, to whom he had sold it, and to take stock in payment of his interest; induced Conner to give up the purchase made by him from Ford, and take paid stock for his interest, part of which he has sold; and induced others to take this paid stock from Conner for valuable consideration, all under the manifest impression which he made upon Conner, and allowed Conner to make

upon all interested, that his mortgage on the lands to be purchased from Conner, and conveyed by Ford, should pass to the company free of his mortgage. Nor, having allowed all this change in the condition of the parties, and having accepted the $2.500 in stock, can he now repudiate the whole, upon the ground that Conner has failed to pay him the sum of $500 in actual money, but insists on setting off an account.

This would be unjust, not only to the other members of the company, but to Conner himself. If Abbott had meant to insist on this payment as a condition precedent, he should have given notice to that effect before the deed was made from Ford and the paid stock issued. To allow the other matters to go on, until the rights of the members of the company became irrevocably changed, participating himself so actively therein, and receiving remuneration for his services under that order of things, amounted to a waiver of the payment of the $500 as a condition precedent, and estops him from now insisting upon the avoidance of the whole matter, because the money was not afterwards paid in hand regardless of set-off.

If this arrangement had not been made, Ford and Conner might have sold the equity of redemption for a valuable consideration in market, before its value might have been devoured by the voracious interest then allowable by law, and running on the debt. It would not have more than doubled the principal, as this decree shows it did. Whether the corporation was valid, or otherwise, it was at least good as a voluntary association, in which the members were partners, with interests proportionate to their shares, and could take property in equity, for partnership purposes.

The shares are valuable, and Abbott must in justice to

all, be held to his agreement to credit the note with $2,500 as of the date of the transfer or issuance to him of the certificates; and to accept as collateral $6,000 of the stock in lieu of so much of the land as was conveyed to the company; and to have his demand of $500 against Conner adjusted, as a further credit on his note, and to recover of Conner to the extent of any amount which he may be due thereon after allowance of all proper set-offs. This lien upon the lands included in the mortgage, and not in the conveyance, remains unaffected. The release does not estop him beyond its equity, which only extended, it seems, to give clear title to the company to the lands conveyed for the purposes of the enterprise. The foreclosure for the whole debt upon the whole lands was erroneous.

There was no error in dismissing the cross-bill of Ford for a specific performance of the agreement, and to compel the members to perfect the articles of association, and the organization of the corporation. This relief is not so closely connected with the subject of the suit, as to make it imperative on the Chancellor to entertain the prayer. Besides, all this kind of relief is generally futile. A forced association would not be apt to be successful, and is rarely ordered—never with any view to its continued operation. Perchance, with the lands relieved of the mortgage the members may all desire to make their organization complete as a corporation, and continue the enterprise. If not, it is better that there should be a separate bill for winding up its affairs, if it can not be done by voluntary agreement.

Inasmuch as there are some equities in the bill, with regard to the lands not conveyed to the company; and others disclosed by the pleadings and evidence, with regard to the claim of $500 against Conner subject to proper

off-sets; and with regard to the interest of $6,000 in the company tendered in court to Abbott as collateral, the bill will not be here dismissed, but will be remanded for further proceedings under such amendments as the parties may be advised to make. The opinion of the court upon the case, as made, is that Abbott should credit the note he holds with the sum of $2,500 as of the date when he received the paid certificates of stock; and with the further sum not to exceed $500 that he may be found to owe Conner by way of set-off, of the date when the same may be found on taking an account, to have been due; and that, for the balance, he is entitled to a decree against all the makers of the note save Kate A. Martin; and that for the satisfaction of said decree he is entitled to an order for the foreclosure and sale of the lands embraced in the mortgage. and not conveyed to the company; and also for the $6,000 interest in the company itself which he is entitled to take as collateral, upon the tender made, if he may choose to accept the same, and that he is entitled to execution for any amount which may still remain unsatisfied. Interest upon his note is under the law to be calculated at 24 per cent. per annum to the date of the money decree, and the decree itself to bear interest afterwards at the rate of 10 per cent. per annum. The bill as to Kate A. Martin should be dismissed.

The lands conveyed to the company are its own unincumbered assets, so far as yet appears, and form, with its other assets, the basis of the value of the shares. The court is also of the opinion that the requisites of the statutes have never been complied with, and that the company has never become a corporation, but exists as a legal partnership.

The appellee must pay the costs of this appeal. The

costs of the court below will be in the discretion of the Chancellor.

Reverse the decree and remand the cause for further proceedings, consistent with this opinion.