DICKSON v. SENTELL.

Opinion delivered July 1, 1907.

83    385
188   335

1. EQUITY—LACHES AS DEFENSE.—Equity will deny relief, though the defense of laches is not pleaded, where the plaintiffs have waited more than fifteen years before suing and until after the death of the principal actors in the transactions upon which the suit is based, unless it clearly appears that the interests of justice require it. (Page 392.)

2. ADVERSE POSSESSION—COLOR OF TITLE.—A written agreement 'to convey a portion of a certain section of land, beginning at the lowest point on the tract, being 120 acres in all, is too vague to constitute color of title, within the rule that possession of part of a tract of land under color of title to the whole may be considered possession of the whole. (Page 393.)

3. SAME—EXTENT OF ACTUAL POSSESSION.—Though a written agreement by a father to give to his son an undesignated portion of a certain section of land is too vague to point out the land, yet where the son took possession of a part of the land intended to be conveyed, put it into cultivation and improved it, his title to so much as was taken into his actual possession will be quieted. (Page 393.)

Appeal from Miller Chancery Court; *James D. Shaver,* Chancellor; reversed.

*Warren & Hamiter* and *L. A. Byrne,* for appellants.

1. Taking into consideration the sale of the land for $201, an inadequate price, the assignment of the certificate of purchase to Geo. W. Sentell, and the fact that it is not shown that the place was held as security for other debts, as also the facts that Dickson remained in possession to the time of his death, and that it was agreed that the place should be reconveyed to him, the conclusion must be reached that Sentell, Sr., held the legal title in trust only. 26 Ark. 240; 52 Ark. 76; *Id.* 473; 53 Ark. 152; 70 Ark. 145.

2. The intimate personal and business relations existing between Dickson and Sentell, Sr., and the subsequent acts of the parties, show that the taking of the deed to the latter was intended as a security for the debt, and the deed should be construed as a mortgage. 13 Ark. 116; 23 Ark. 479. See also 85 Ill. 304; 43 Ill. 282; 179 Pa. 146; 90 Va. 533; Smith on Frauds, § 100; Jones on Mort. (3d Ed.) § 251. A sheriff's deed may be construed to operate as a mortgage. 2

Devlin on Deeds, § 1140. And in this case the sheriff's deed should not be allowed to defeat the true owners. 40 Ark. 62; 26 Ark. 240; 37 Ark. 195; 2 Devlin on Deeds, § 1178; 2 Pomeroy Eq. Jur. § § 956, 957.

3. The rights of third and innocent parties are not involved here, hence there is no application of the doctrine of estoppel based upon any declarations of Dickson. One can not be deprived of his title by mere declarations or statements. 54 Ark. 465; 36 Ark. 96; 15 Ark. 55; 53 Ark. 196; 58 Ark. 20. The admissions both of Sentell and his wife that Dickson owned the place, the latter stating that she would carry out her husband's wishes, the proof on this point being uncontradicted, should have been taken by the chancellor as binding on him to regard the title in the same light as that in which the Sentells regarded it. 16 Cyc. 977-980; 42 Ark. 511; 59 Ark. 611.

4. It appearing that, prior to the levy of the execution on the land and long before the transfer of the certificate to Sentell, R. H. Dickson went into possession of the land claimed by him under a written agreement by David E. Dickson to deed it to him, and that he improved and held possession of it for 15 years with the knowledge and consent both of his father and G. W. Sentell, he is clearly entitled to that part of the land.

*C. B. & Henry Moore,* for appellees.

1. As to the interest of R. H. Dickson, now deceased, there is no proper appeal. His personal representative, executor or administrator would be the only one authorized to prosecute an appeal. 47 Ark. 411; 52 Ark. 554; 28 Ark. 478. See also 29 Ark. 60.

2. The decree should be affirmed because the transcript does not purport to contain all the evidence heard in the case. 72 Ark. 185.

3. The findings of the chancellor will not be set aside unless clearly contrary to the weight of the evidence.

4. Chancery is without jurisdiction. This is a suit to remove cloud on title, and plaintiffs allege that defendants are in possession of the land, which is not denied. 72 Ark. 256; 56 Ark. 370. Objections to jurisdiction may be raised at any time. Kirby's Digest, § 6096.

5. Appellants are barred by limitation, and this defense need not be pleaded, but is available at any time. 39 Ark. 158.

6. If Sentell made any promise to convey to R. H. Dickson, it was a verbal promise and void under the statute of frauds.

7. Oral proof is inadmissible to engraft an express trust upon a deed which is absolute in its terms. 57 Ark. 632. There was no original agreement at the time of the purchase upon which to base a resulting trust, and a resulting trust can not arise in contradiction of the terms of the deed. 9 Ark. 518. And when one purchases land with his own money, no contemporaneous or subsequent parol declaration of trust can affect his title. 42 Ark. 503; 45 Ark. 481.

RIDDICK, J. This a suit in equity brought by the heirs of David E. Dickson, deceased, of Lafayette County, Arkansas, against the widow and heirs of G. W. Sentell, of New Orleans, to have the deed under which the defendants claim title to a tract of land in Miller County, formerly owned by David E. Dickson, cancelled and the title of the plaintiffs to such land quieted and confirmed.

The main facts in the case are as follows: David E. Dickson, a planter, who lived at Walnut Hill in Lafayette County in 1880, owned a tract of land of 810 acres in Miller County, five or six miles distant from his home place. A hundred or two acres of this Miller County land was in cultivation, and was known as the "Dickson Place." Dickson seems not to have been a man of good judgment in business matters, and relied on others to assist him in his business transactions. At that time his chief adviser was G. W. Sentell, a merchant of New Orleans, who was a brother-in-law of Dickson, having married his sister. Sentell seems to have been the opposite of Dickson as a business man, and was energetic and successful in business. They were both men of excellent character, and were not only connected by marriage, but were intimate friends and much attached to each other. Dickson, being the owner of a farm that was subject to overflows from Red River, either on account of the hazards to which he was thus exposed, or from lack of the qualifications required to win success in farming, or for other reasons, became more or less embarrassed financially, and was assisted from time to time by Sentell. In this

way Dickson became in 1880 indebted to Sentell for about twenty-five hundred dollars, and executed to him a mortgage on the plantation in Miller County, containing, as before stated, 810 acres.

Afterwards Alex Byrne, administrator of the estate of Geo. Cheatham, recovered, as such administrator, judgment against Dickson for $201.87, and the land mortgaged to Sentell was levied upon under an execution issued on this judgment, and sold on the 14th of January, 1882, and purchased by Byrne as such administrator, to whom the sheriff delivered a certificate of purchase. Afterwards Byrne transferred this certificate of purchase to Sentell, who paid him the amount he had bid for the land; and afterwards, the land not being redeemed, in November, 1885, the sheriff executed and delivered to Sentell a deed conveying the land to him.

Dickson, as before stated, did not live at this place. He lived about five or six miles away in another county, but after the sheriff conveyed the land to Sentell he continued to look after the place, either in his own interest or as agent of Sentell. He attended to the renting of the land, but the rent notes were generally made payable to Sentell or to Dickson as agent and then transferred to Sentell. Sentell received the rents and furnished the supplies for the place, and when improvements were contemplated he was consulted; and if the improvements were made he furnished the money to pay for them. But the evidence is conflicting as to whether he did this as the owner of the land or at the instance of Dickson and in his interest, or whether he claimed the title absolutely or only held it as security for the advances he had made, and was still from time to time making, to Dickson. There is evidence tending to show that Dickson claimed this land, and that Sentell recognized his ownership; on the other hand, there was evidence that after he had obtained the sheriff's deed Sentell asserted his ownership over the land, and that Dickson treated him as owner of the land.

Sentell died in 1895, leaving a will in which he devised half of this land to his widow and half to his heirs. The heirs conveyed their interest to the widow, and since that time she has claimed to be the owner of the land, though there is testimony

tending to show that she on one or two occasions said that
her husband intended that this land should go to R. H. Dickson,
a son, and Albert Dickson, a grand-daughter, of Dickson, and
that she would carry out his wishes. After her husband's death
she received the rents from the place and continued to make ad-
vances and furnish supplies to David E. Dickson, her brother,
as her husband had previously done.

Dickson had in 1880 promised his son, R. H. Dickson,
to give him 120 acres of this land, and had given him a writ-
ten agreement to convey the land to him by the 1st day of
June, 1882. It seems that he had also promised to convey a
portion of the tract to his other son, Albert; but Albert died
without taking possession of the land, leaving surviving him as
his only heir a daughter, also named Albert. R. H. Dickson
took possession of the land which his father agreed to convey
to him, and leased it to a tenant, and in that way put in cultiva-
tion some thirty or forty acres.

There is some testimony tending to show that Sentell, after
he secured title, told R. H. Dickson and his father that the sons
should have the land which their father had promised to con-
vey to them; but the evidence does not show whether this oral
promise of Sentell was made before R. H. Dickson had im-
proved the land or not.

After Sentell died, David E. Dickson made some effort to
induce the widow and heirs of Sentell to convey a portion of
this land to his son and grand-daughter. In 1899, after the
death of Sentell, he wrote to his son, Geo. W. Sentell, Jr., tell-
ing him that he, Dickson, was about eighty years old, and that
he would not live much longer, and stating that he was very
anxious to see him and his mother. "I want to know if me
or my grand-children are to have the land once given to them.
* * * Your father told sons Hugh and Albert both that
he would give them eighty acres apiece off the tract, and son
Hugh has controlled his ever since."

The widow and heirs of Sentell declined to make these
conveyances. David E. Dickson died in 1900, leaving surviving
him a son, R. H. Dickson, known as Hugh Dickson, and a
grand-daughter Albert Dickson. They filed their complaint in
this action in October, 1903, and had warning order published.

The widow and heirs of Sentell appeared and filed their answer in March, 1904. On the hearing the chancellor dismissed the complaint for want of equity, and we are now asked to reverse his judgment on appeal.

At the outset, we have to say that this is not, at least in form, a suit to have the conveyance to Sentell declared to be in effect a mortgage and to have an accounting between the estates of Sentell and Dickson, so that if any balance remained due from Dickson to Sentell or his estate at the time of Dickson's death, it could be paid. It is a suit to set aside a deed executed by a sheriff to Sentell as cloud on the title of the plaintiffs, and, because it was procured by fraud, without any offer on the part of plaintiffs to pay the sums, if any, that David E. Dickson owed the Sentells at his death.

It is evident that, if David E. Dickson knew that Sentell had taken a deed from the sheriff conveying this land to him in 1885, the fact that he brought no action to set this conveyance aside, although Sentell lived ten years and Dickson fifteen years afterwards, would raise a strong presumption against the right of his heirs to recover in this action.

But counsel for plaintiff contend that the evidence shows that Dickson did not know until 1897, a short while before his death, that the sheriff had executed a deed to Sentell. There is some evidence to support this theory, but there is also evidence tending to show that Dickson did know this. His own letters tend to show it; and the fact that he allowed Sentell to pay the taxes on the land after that date is a circumstance tending the same way. In 1889 Dickson wrote to Sentell, and gave him a detailed account of the farming operations on the place, and informed Sentell that the rents of the place could be increased if he would pay for having the fences repaired, and asked him to state what he wished to have done about it, thus indicating that Sentell had control of the place. After Sentell's death he writes to Sentell's son, asking him and his mother to carry out the promise of Sentell to give R. H. Dickson and Albert Dickson each 80 acres of the land. Why should Sentell be promising Dickson to give his son and grand-daughter each 80 acres of this tract of land if the land belonged not to him, but to Dickson? Why should Dickson beseech the widow and heirs of Sentell to

carry out this promise of Sentell if he and not Sentell owned the land? These letters are not disputed. They clearly indicate the ideas of Dickson at the time he wrote them as to the ownership of this land, and are entitled to much more weight than the testimony of witnesses to conversations that occurred years before, when the possibility of a misunderstanding of the conversation on the part of the witnesses, or that their memory does not accurately retain it, must be considered. The written word remains, and we can rely upon these letters as expressing correctly the ideas of the writer at that time. It is true that these defendants have not produced all the letters that Dickson wrote; but they were not asked if they had others in their possession, and there is nothing in the evidence to justify us in saying that they have concealed evidence. The fact that Dickson knew of the deed to Sentell is also shown by the testimony of several witnesses, and the fact that Dickson paid no taxes on the land after Sentell obtained' the title.

In addition to the evidence that tends to show that Dickson knew of this conveyance long before his death, the relations between these two men were such as to make it unreasonable to believed that Sentell concealed this fact from Dickson. Sentell was a successful business man; he was a brother-in-law and an intimate friend of Dickson. The evidence does not show that he was trying to make money out of Dickson. On the contrary, it shows that he was endeavoring to aid Dickson, and to assist him as one friend would another. The tract of land at that time was of no great value, and there seems to be little, if any, reason why Dickson should perpetrate a fraud on his brother-in-law in order to get possession of it. There is more reason to believe that this conveyance from the sheriff to Sentell was made with the knowledge and consent of Dickson. He owed Sentell at that time several thousand dollars, which he was probably unable to pay, and for which Sentell held a mortgage on this land; and he allowed Sentell to take the conveyance from the sheriff, thinking no doubt that Sentell during his life would continue to aid him, and probably make some provision for himself and family afterwards. Sentell seems to have been generous in aiding Dickson during his whole life; but when he died, he left his property, including this land, to his

own wife and children. Dickson had proved to be unsuccessful in his business, and Sentell probably thought it prudent not to give Dickson property, but to leave it to Mrs Sentell, who was Dickson's sister, to extend him and his family such aid as she saw proper. She did continue to extend aid; but she refused, probably on the advice of her son and son-in-law, to give to him or his heirs the title to any portion of this property, and hence this suit.

Neither laches nor the statute of limitations was set up as a defense in this case, the defendants simply denying most of the material allegations of the complaint. But, though laches was not pleaded, still this long delay must be considered. It lasted until Sentell and Dickson, the two principal actors in the transactions upon which this suit is based, and who probably alone fully understood them, were both dead. After a delay that has sealed the mouths of these two most important witnesses, a court of equity ought not to set aside this deed unless clearly satisfied that the interests of justice require it and that Dickson had no notice of the adverse claim of the Sentells to his land until shortly before his own death. But the chancellor found against this theory, and a careful consideration of the evidence has failed to convince a majority of the court that his finding is against the weight of evidence.

It may be that when Sentell secured the title to this land it was with the intention of reconveying it to Dickson if Dickson ever repaid the amounts due Sentell, and that he found afterwards that Dickson could never redeem the land. But this is mere speculation; the two principals who could have cleared this mystery are now dead, and, in view of the conflict in the evidence and doubt that surrounds the facts, it is safer now, as between their heirs, to let the title to this land remain as they left it.

The contention that Alex Byrne, administrator of the Cheatham estate, had no authority to transfer the certificate of purchase to Sentell cannot be entertained, for that is a matter that concerns the Cheatham heirs only, and they are not complaining. If that contention were true, it might show that the land in equity belongs to the Cheatham heirs, but it could not aid the plaintiffs.

The only remaining point to notice arises on an amend-

ment to the complaint in which R. H. Dickson, one of the plaintiffs, alleges that his father gave him 120 acres of this land; that he took possession of it and improved it, and that Sentell assured him he should have what his father had promised him, and he asks that his title thereto be quieted. This amendment was based on an entirely different cause of action from that alleged in the original complaint. But no objection was made to it, and we will consider it.

The evidence shows that R. H. Dickson took possession of a part of this land under a written promise from his father, made in 1880, that he would convey the land to him as soon as the boundaries could be surveyed and ascertained. This writing does not give a clear description of the land, for the reason that, as before stated, the boundaries had not been ascertained; but the writing states that the part conveyed to R. H. Dickson will commence "at the lowest point on the tract," and will include a portion of section 24, T. 18, R. 26 W., being 120 acres in all. This description is so vague that it does not constitute color of title, so that possession of part will be considered possession of the whole. But it tends to explain the nature of the possession by R. H. Dickson.

He leased a part of this land to tenants, and in that way he put in cultivation some thirty or forty acres. This contract with his father was made before Sentell obtained the title, but R. H. Dickson continued to hold possession of this land, collecting the rents and exercising acts of ownership over it down to the time the suit was brought in this case. There is some testimony that, after Sentell secured the title to the land, he assured R. H. Dickson that he should have the land his father gave him. But the evidence does not clearly show whether this was before R. H. Dickson made the improvements or afterwards. It is clearly shown that Sentell recognized his right by allowing him to control the place and collect the rents therefrom as if he owned it. The only serious evidence against the claim of R. H. Dickson to this land is that he never had it assessed separately from the main tract, and that Sentell paid the taxes on the whole tract, including the land of R. H. Dickson. But when we consider that R. H. Dickson held continuous possession of this land under claim of title as a gift from his father

for ten to fifteen years, that during all that time his right to it
seems to have been conceded by the defendants and Sentell,
that he has put it in cultivation and improved it, we are of the
opinion that he has acquired title to that part of which he took
actual possession and improved which a court of equity should
protect, and that his title thereto should be quieted. *Guynn* v.
*McCauley,* 32 Ark. 97-116; *Vandiveer* v. *Stickney,* 75 Ala. 225;
*Commonwealth* v. *Gibson,* 85 Ky. 666; *Shafer* v. *Hallser,* 111
Mich. 622; *Bevington* v. *Bevington* (Iowa), 64 Central Law
Journal, 286.

Ordinarily, the possession by a vendee of land under a bond
for title is not adverse to the vendor; but when he has paid the
purchase price and fully performed his part of the contract,
his possession then becomes adverse. R. H. Dickson took pos-
session of this land under a written promise from his father that
he would convey him the title as soon as it was surveyed. The
evidence shows conclusively that he intended to give his son
this land; and his son took possession of it and improved it under
this promise. There was nothing further for the son to do. He
remained in possession of it until after his father's death, and
until this suit commenced, though it seems that the tenants to
whom he had rented the land about the time this suit com-
menced promised to pay the rent to defendants. But that did not
affect Dickson's title, nor does the fact that after his father's
death, and shortly before this action commenced, he endeavored
to get the defendants to make a deed conveying the land to him.
This was not a recognition of their right to the land, but of the
fact that the legal title only was in them, and that they held
this title for him. He endeavored to avoid a law suit in that
way, and this he had a right to do. R. H. Dickson died after
this suit was commenced.

After fully considering this branch of the case, we are of
the opinion that he owned this land, and that the title of his
heir, . . . . . . . . . . Dickson, to this land improved by his father
should be quieted.

The decree of the chancellor to that extent will be reversed,
and the cause remanded with an order that a commission be
appointed to ascertain and report the quantity and description
of the land improved by R. H. Dickson, and also the amount of

taxes paid by Sentell in that part of the tract, and that, upon the coming in of the report, the plaintiff, ...... Dickson, have a decree quieting his title to that part of the land, and Mrs. Sentell be charged with rental value of that part of land since she took possession thereof and have credit for the taxes and interest paid by her thereon, and, if any balance be due her, it shall be a lien on the land.

In all other respects the judgment is affirmed.

Justices BATTLE and WOOD dissent except to so much of the opinion as relates to the R. H. Dickson tract of land.