## STEWART OIL COMPANY *v.* BRYANT.

### Opinion delivered May 8, 1922.

1. TRUSTS—EVIDENCE TO SUSTAIN FINDING OF RESULTING TRUST.—Evidence *held* to sustain a finding that plaintiffs contributed certain sums in consideration of receiving an interest in an oil and gas lease proportioned to the agreed value of such lease; and where title thereto was taken in the name of a third person for the benefit of the plaintiffs and others, such person became a trustee for their benefit, and they in equity became the owners of the lease.

2. ESTOPPEL—ACQUIESCENCE.—Where plaintiffs, owning an equitable interest in a certain oil and gas lease, knew that the trustee holding the legal title had conveyed the lease to a corporation formed

to develop the lease, and that stock in such corporation was being sold to innocent purchasers, and that a part of the stock had been transferred to a driller who incurred large expense in reliance upon such transfer, and plaintiffs stood by in silence until their interest in the lease had been largely enhanced by such expenditures, plaintiffs were estopped to question the legality of the formation of the corporation and of the transfer of stock therein by reason of their failure to question same within a reasonable time.

Appeal from Union Chancery Court; *J. Y. Stevens,* Chancellor; reversed.

*Marsh & Marlin, Jones & Head* and *Powell & Smead,* for appellants.

Appellees having kept silent and permitted the organization of the corporation, the sale of stock to innocent parties, and the rights of others to intervene are now estopped from asserting any claim other than that of stockholders, or the right to have their money, with interest, returned to them. 131 Ark. 77; 2 Pom. Eq. Jur. § 804; 99 Ark. 260; 16 Cyc. 679; 64 Ark. 627; 147 Ark. 555; 21 C. J. p. 1216; § 221; 91 Ark. 141; 35 Ark. 377; 76 Ark. 67; 42 Ark. 473; 97 Ark. 588; 27 Ark. 371; 38 Ark. 419; 81 Ark. 269; 86 Ark. 284; 106 Ark. 568; 102 Ark. 146; 98 Ark. 581; 14 C. J. 630, § 920.

Appellees have not met the burden of proof to establish a resulting trust. 11 Ark. 82; 127 Ark. 302; 101 Ark. 451; 105 Ark. 318; 79 Ark. 425; 71 Ark. 373; 75 Ark. 451; 3 Pom. Eq. Jur. § 1040; 1 Perry on Trusts, § 139; 111 Ark. 45; 118 Ark. 146; 104 Ark. 303; 89 Ark. 182; 71 Ark. 277; 76 Ark. 14.

The corporation was an innocent purchaser of the lease. Sec. 1504, C. & M. Dig.

*Patterson & Rector,* for appellees.

A chancellor's findings of fact will not be disturbed upon appeal unless against the clear preponderance of the evidence. 132 Ark. 402; 136 Ark. 624; 129 Ark. 120; 138 Ark. 403.

The established facts show that the original transaction created a resulting trust. 40 Ark. 62; 64 Ark. 155;

Tiffany on Law of Real Estate (2nd Ed.) p. 397, 402-3; 30 Ark. 230; 89 Ark. 168; 118 Ark. 146; 137 Ark. 14; 132 Ark. 402; 147 Ark. 555; 109 Calif. 481; 17 Wall. 44; 138 U. S. 591; 147 Mass. 326; 23 N. J. Eq. 13; 184 Mass. 145; 141 Ill. 604; 106 Ill. 384; 107 Iowa 333; 103 Tenn. 324; 103 Mass. 484; 79 Ala. 351; 132 Ind. 58; 2 A. & E. Ann. Cas. 664, and note.

Appellant was not a *bona fide* purchaser for value of the lease. 79 Ark. 273; 78 Ark. 501; 77 Ark. 172; 107 Ark. 232; 118 Ark. 192; 14 C. J. 264; 14 A. C. J. 482, *et seq.*

Appellant did not succeed to the rights of the plaintiffs as tenants in common in the lease, because (1) it had no subscription from plaintiffs for its stock. Fletcher Law of Corporations, vol. 6, sec. 3952; 137 Minn. 213; 1 Thompson (2nd ed.) sec. 545 *et seq.*; 14 C. J., sec. 920; (2) the terms of offer were not complied with, and no contract resulting in membership in a corporation ever existed; 94 Ark. 354; Cook on Corp. (6th ed.) sec. 194; 10 Cyc. 405; (3) appellees are not barred by any act amounting to an equitable estoppel or ratification of the unauthorized conversion of their property; 44 Ark. 48; 101 Ark. 398; 27 R. C. L. 730; 147 U. S. 133; Ann. Cases 1914-A, 39; 65 A. D. 314; 120 S. W. 1065; 87 S. W. 740.

Appellant cannot successfully plead estoppel. 55 Ark. 423; 91 Ark. 141; 96 Ark. 609; 89 Ark. 19; 63 Ark. 289, etc.

WOOD, J. This action was instituted by the appellees (hereafter called plaintiffs) against the appellants (hereafter called defendants) to cancel the assignment by M. G. Wade, trustee, to the Stewart Oil Company, of a lease to forty acres of land in the oil and gas region near El Dorado, in Union County, Arkansas, and to cancel a certain drilling contract entered into with one J. W. Clark, and for an accounting, etc.

On the 31st day of January, 1921, W. J. Ward, party of the first part, representing himself and other owners of the lease of the land in controversy, entered into an escrow agreement with John A. Cobb, H. F. Stewart and B.

A. Hancock, parties of the second part. The agreement specified that the sum of $8,000 was to be placed in the bank together with the lease of the land in controversy and the assignment thereof. M. G. Wade was named as trustee in the lease. When the title to the lease was approved by the attorney of the parties of the second part, the escrow agent was to deliver to the party of the first part the $8,000, and to the parties of the second part the lease and assignment.

Gill Bros. and A. G. Griffin, real estate brokers at El Dorado, had an option on the lease. The Stewart Oil Company, a domestic corporation, (hereafter called corporation) was incorporated on the 7th of February, 1921, for the purpose of acquiring leases and royalties and drilling and maintaining wells for the production of oil and gas, etc. On the 10th of February, 1921, the owners of the land in controversy, for the consideration of $9,000, executed an oil and gas lease thereof to M. G. Wade, trustee. On the 21st of March, 1921, M. G. Wade, trustee, for the consideration of $1 executed an assignment of the lease to the corporation. On the 23rd of March, 1921, the corporation entered into a drilling contract with J. W. Clark, by which it conveyed to him a two-thirds interest in the lease in consideration that he drill at his own expense all wells necessary to properly develop the land for oil and gas production, and in case of production from any wells in excess of one hundred barrels he was to deliver one-third thereof to the corporation, and if the production was less than one hundred barrels then the corporation was to bear its proportion of the expense of operating the wells.

In their complaint against the corporation and Wade and Clark, the plaintiffs challenged the assignment of the lease from Wade to the corporation. They alleged that as trustee he had no authority to assign the lease, and that the corporation had no authority to execute the drilling contract with Clark; that the corporation and Clark knew at the time of the execution and delivery of the assignment and the drilling contract that Wade held the legal title for the benefit of the plaintiffs and others who were sub-

scribers to a fund in the sum of $11,000 to be raised for the purpose of purchasing the lease and defraying such expenses as might be necessary in developing the same.

They alleged, among other things, that Stewart, who promoted the project for purchasing the lease, solicited their subscription to a fund of $11,000, which he represented would be the amount necessary to purchase the lease and pay the commission of the brokers of $1,000, and defraying such other expenses as might be necessary to take over and develop the property; that the plaintiffs subscribed to this fund with the understanding that they should have an undivided interest in the lease in proportion that the amounts subscribed by them respectively bore to the sum of $11,000, and that Wade held legal title as trustee for them. They alleged that Stewart and others who were promoting the project organized a corporation with a capitalization of $50,000; that Stewart persuaded Wade, the trustee, in fraud of the rights of plaintiffs, to execute an assignment of the lease to the corporation, and the corporation in turn executed the drilling contract to Clark, both of which instruments were clouds on their title.

The corporation and M. G. Wade in a joint answer admitted that Wade, acting as trustee for plaintiffs and other parties, procured the oil and gas lease, and assigned the same to the corporation; that Stewart and others organized the corporation as alleged, and admitted the execution and delivery of the drilling contract to Clark on March 23, as alleged. They denied all the other allegations of the complaint, and set up that the funds were necessary to purchase the lease, and were subscribed with the understanding that the title should be taken in the name of the trustee, and that as soon as the title was obtained a corporation or syndicate was to be organized based upon the acreage contained in the lease; that certificates of shares of stock in the corporation were to be sold for the purpose of developing the property; that, pursuant to this plan, Stewart and his associates approached the plaintiffs and others and explained to them fully the

purpose of the promoters as above outlined in procuring the lease, and that the plaintiffs made their subscriptions with the understanding that the corporation or syndicate would be organized in which the shares of stock or certificates would be sold for the purpose of raising funds with which to develop the property for oil and gas and to defray the expense incident thereto; that, after sufficient subscriptions had been obtained to purchase the property and notice to all subscribers given, the corporation was organized pursuant to the above plan; that a majority in value of the subscribers to the original fund of $11,000 were present and took part in the organization of the corporation; that there were issued to the original subscribers to the stock of the corporation the number of shares of stock corresponding at par value to the amount of money they had actually subscribed to the original $11,000, which they accepted with full knowledge of all the facts and circumstances concerning the issuance thereof, and kept and retained the same; that they permitted Clark, under the contract, to expend large sums of money in developing the property, and never complained until Clark had proceeded with his drilling to a depth where he had reached pay sand and at about the time two other wells on adjoining property had been brought in as large producers. Not until then did the plaintiffs attempt to return the stock to the corporation and repudiate its right to hold the lease and to make the drilling contract with Clark. The defendants alleged that this conduct on the part of the plaintiffs should estop them from obtaining the relief for which they prayed.

Clark, in a separate answer, adopted the allegations of the answer of the corporation and Wade, and set up his drilling contract with the corporation and alleged that the same was made in good faith, believing at the time that the corporation had the title to the lease in controversy and without any information or knowledge of an adverse claim to the property. He set up that he had, in good faith, entered into the performance of his contract and had expended large sums of money in drilling the

well before he had any notice of the plaintiffs' claims; that by reason of these facts he was an innocent purchaser for value of a two-thirds interest in the lease under his drilling contract with the corporation. He also alleged that the plaintiffs knew that he was expending large sums of money in drilling the well, and that they stood by until the well was practically completed and had reached the pay sand before asserting any claim adverse to his claim and the claim of the corporation; that by such conduct they were estopped, and therefore not entitled to the relief prayed.

1. The first question is whether or not the money furnished by the plaintiffs was subscribed and paid by them for the purpose of contributing, *pro tanto,* to the common fund of $11,000 which was to be used in purchasing the lease in controversy, the title to which was to be taken in Wade, the trustee, to be held for the benefit of the plaintiffs and others, the equitable owners, who contributed to the fund in the proportion as the respective amounts paid by them bore to the $11,000? This is purely a question of fact, and it could serve no useful purpose to set out in detail the testimony bearing on this issue.

The testimony of the plaintiffs, in substance, was to the effect that the parties who solicited their subscriptions represented to them that the purchase price of the lease would be $11,000; that they had no knowledge at the time that a corporation was to be organized to take over the lease; that none of them at the time of making their subscriptions contemplated that they were subscribing to the capital stock of a corporation in the sum of $50,000, to be afterwards organized to take over the lease and develop the property. None of them had any notice of any meeting of the subscribers to the $11,000 fund of the promoters of the enterprise, for the purpose of organizing a corporation. Some of the plaintiffs testified that, after they had ascertained that a corporation had been formed and that it was the purpose of the trustee to convey the lease to the corporation, they objected to his doing so, and he promised that he would not do so, but afterwards

changed his mind and conveyed the lease to the corporation without the knowledge and consent of any of the plaintiffs, and when some of them were out of town.

All of the plaintiffs testified that it was their understanding that they each would acquire an interest in the lease in the proportion that the amounts of their subscriptions respectively bore to the sum of $11,000; that is, those subscribing $1,000 would acquire a one-eleventh interest, those subscribing $500 a one-twentysecond interest, and so on. The testimony of Stewart, who solicited the subscriptions on behalf of the defendants, was in substance to the effect that he represented to the subscribers that he was raising a fund for the purpose of purchasing the lease and developing the same. He represented to the subscribers that they were contributing to a fund which would be used by a syndicate or corporation, whichever plan was deemed best, for the purpose of taking over and developing the property. He did not represent to any of the subscribers that they were buying an interest in the lease itself. His plan from the beginning was to syndicate or incorporate as it might be deemed best; that it was ascertained that in order to sell the stock it was necessary to organize a corporation because the State bank examiner was against syndicates.

Two other parties, who were associated with Stewart in the enterprise, testified corroborating the testimony of Stewart to the effect that their first plan was to form a syndicate, but they afterwards changed to a corporation. It was understood that they were to sell shares in the syndicate or corporation as the case might be. One of these witnesses, however, after testifying as above, also testified that the promoters valued the lease for the purposes of the syndicate at the sum of $11,000.

M. G. Wade, who is named as the trustee in the lease, testified that it was his understanding that a company or syndicate was to be formed, and they changed it to a corporation because it would be more difficult to pass the blue-sky law. He understood that the money paid him by the subscribers was to buy stock in the Stewart syndicate.

This was evidenced by the receipt he issued, and no objection was made to the receipt by any of them. He further testified that he didn't assign the lease to the corporation until he was informed that all of the plaintiffs except Center were satisfied for him to do so, and did not assign the lease until two of the promoters assured him that it would be satisfactory with Center.

The chancellor found "that the plaintiffs herein and each of them furnished a part of the money with which the lease was purchased, and that as a result thereof the equitable title in and to said lease and all rights therein, thereto, and thereunder, vested in said plaintiffs to the extent of their respective interests;" that is, in proportion as the amounts subscribed and paid by them respectively bore to the purchase price of the lease, which was the sum of $11,000.

While there is a sharp conflict in the evidence, we are convinced that a preponderance of the evidence sustains the finding of the trial court that the several amounts subscribed and paid by the plaintiffs were to purchase the lease in controversy in which they would acquire an interest in proportion as the amount subscribed and paid by them bore to the sum of $11,000. The undisputed testimony shows that the purchase price of the lease was $8,000, and that the promoters and real estate brokers who had an option on the property, agreed among themselves that an additional sum of $3,000 would be added to cover their services, and that, for the purpose of ownership to those who wished to subscribe, the lease would be valued at the sum of $11,000. While the testimony of Stewart and other witnesses on behalf of the defendants tends to show that the subscriptions were taken for shares in a syndicate or corporation that was afterwards to be organized to buy the property and develop the same, yet it occurs to us that a clear preponderance of the evidence shows that Stewart, in soliciting the subscriptions of the plaintiffs to a fund to purchase the property, gave them to understand that they would own an interest in proportion as the amount subscribed and paid by them bore to

the sum of $11,000, the agreed value of the lease. In other words, whether the lease was to be purchased, owned and developed by a syndicate or corporation, the plaintiffs and others who contributed money for the purpose of purchasing the lease were to be owners in the syndicate or corporation in the proportion that their respective subscriptions bore to the purchase price of the lease, to-wit: $11,000. We are convinced that it was not contemplated by the plaintiffs, or Stewart, who solicited their subscriptions, that they were then subscribing to shares of capital stock of a corporation which was afterwards to be organized and capitalized at the sum of $50,000, and that the amounts subscribed by them would entitle them to shares in the corporation in proportion as the amount subscribed bore to the capital stock of $50,000. As we view it, the evidence does not at all justify such conclusion of fact. When, therefore, the trustee paid over the money subscribed by the plaintiffs and others to purchase the lease and a deed was executed and delivered to him, he thereby, became a trustee for them, and they in equity became the owners of the lease—the plaintiffs in proportion as their respective subscriptions bore to the entire purchase price of the lease. The court did not err in its finding of fact and conclusion of law as above set forth. See *Camden* v. *Bennett,* 64 Ark. 155; *Miller* v. *Freeman,* 40 Ark. 62; *McNamara* v. *Garrity,* 106 Ill. 384; *Skeehill* v. *Abbott,* 184 Mass. 154; *Leary* v. *Corvin,* 2 A. & E. Ann. Cas. p. 664, and note 667, and authorities of other jurisdictions cited in appellee's brief.

2. The only other question necessary for our consideration is whether or not the plaintiffs are estopped by their conduct from challenging the deed of the trustee to the corporation and the contract of the corporation with J. W. Clark. The assignment of the lease by Wade to the corporation was executed on March 21, 1921, and on the 23rd of March, 1921, the corporation executed the drilling contract to J. W. Clark by which, for the consideration therein named, the corporation transferred to

Clark a two-thirds interest in the lease. The consideration for the transfer of the two-thirds interest to Clark was that he should properly develop the property and maintain the lease for oil production. He was to begin preparing for the drilling immediately and to begin actual drilling as quickly as possible. He was to assume all liability for the expense of drilling the first well and was to drill same to a depth of 2300 feet, unless oil and gas were found at a lesser depth. The deed and drilling contract were recorded on the days respectively of their execution.

The corporation was organized on the 7th of February, 1921, its articles of incorporation being filed at the office of the clerk of Union County on that day. The declared purpose of the corporation, among other things, was to drill, operate, and maintain wells for the purpose of producing oil and gas and to acquire leases in real estate. A circular was issued by the corporation showing that it was capitalized at $50,000 and offering to the investing public 1,000 shares of the par value of $50 each and specifying that it was "organized to drill on the Jeff Ward tract"—the land in controversy. It further stated: "The derrick is up and the well is to be drilled by H. F. Stewart, the man who drilled the Mitchell-Busey well;" that "operations would be started at once," and further requesting subscribers to make all checks payable to M. G. Wade, cashier of the First National Bank and the secretary and treasurer of the corporation. The above circular appeared in the papers at El Dorado February 14, 15, 16, 19, and 23rd. It is in evidence that the corporation sold from twenty to twenty-five thousand dollars worth of stock to about eighty stockholders in El Dorado, Hot Springs, Little Rock and other places from the time of its organization to March 17, 1921, after which time no stock was sold.

All of the plaintiffs testified that they had no notice that a corporation was to be organized; but all of them lived in El Dorado except Center and the Gills, and they saw the advertisement above set forth in the newspapers.

What is designated in the record as the "Keen-Wolf" well, located about three-quarters of a mile from the land in controversy, was brought in about the middle of March. Clark began drilling operations under his contract about the 25th of March and proceeded to drill the well down to the pay sand, reaching the same about the 25th of April. When pay sand is reached, the well is then only within a day or so of completion. During this time no complaints were made by any of the plaintiffs to Stewart, the president of the corporation. Clark brought in an oil well on the 5th of May, 1921, which produced four or five thousand barrels of oil daily, worth 75 cts. per barrel.

The stock was issued and delivered to the plaintiffs, Bryant, the Pyes, and Johnson, about the 2nd of March, 1921, and to the Gills about the 21st of March, 1921. According to the testimony of the secretary and treasurer of the corporation, after the Keen-Wolf well came in, J. L. Center inquired of him to know if he could obtain $500 additional stock to the $500 he had already subscribed, and witness informed Center that he could. They discussed the drilling contract, and Center stated that he would let the witness know in a day or two whether he wanted the additional stock. Center went away and never came back. He refused to accept the tender of the stock or a tender of the money which he had subscribed and paid.

None of the stock that was issued and delivered to the plaintiffs was returned to the corporation until about the 10th or 11th of May. At the time of entering into the drilling contract with the corporation, Clark had no knowledge that any other parties were claiming to own the lease. He had not fully complied with the contract with the corporation, but had gone as far as he could.

It was shown on behalf of the defendants that, before the stock book was received, E. W. Bryant, one of the plaintiffs, was in the office of the secretary and treasurer of the corporation from February 25th, at different times until the stock was issued to him on the 2nd of March, 1921, wanting to know when he could get his stock. It was shown by three witnesses who testified on behalf of

the defendants that after the organization of the corporation there was a meeting of the stockholders in the office of the secretary and treasurer of the corporation at which M. B. Gill, one of the plaintiffs, proposed to sell stock for the corporation on a commisssion of 30%. M. B. Gill, in explanation of this conversation, stated that he said at this meeting if they wanted to give 30% he knew of two parties who could sell the stock. He was asked if he knew whom they could get to sell this stock. He did not know at the time what his interest would be—did not know at that time, if they increased the capital stock, whether his interest would be increased or not. He understood they were trying to sell stock to drill a well.

Bryant and Center both testified in rebuttal that when they were making inquiries about the stock they thought they were to have stock issued in the proportion that the amount paid by them bore to $11,000. Center stated that he never agreed to accept any stock from the secretary and treasurer except the stock representing a one-twentysecond interest. They proposed to give him $500 stock in a $50,000 corporation, and he refused to accept it.

This suit was instituted by the plaintiffs on the 22nd day of April, 1921.

We have reached the conclusion that under the facts as above set forth the plaintiffs are estopped by their conduct from maintaining this action. Stewart, who was an experienced driller of oil wells, was the leading promoter in the enterprise to acquire the lease in controversy and to develop the same. Plaintiffs and others who subscribed to the common fund to purchase the lease looked to him as the moving spirit in the project. It was shown that the circular above mentioned was widely distributed, and the plaintiffs at least certainly had notice as early as February 14th, when this circular was published in the papers at El Dorado, that the corporation had been organized, with Stewart as its president, to drill on the lease in controversy, and that the corporation was offering to sell 1,000 shares of stock for that purpose. The corporate

entity in this litigation stands for all of its eighty or more
shareholders who purchased stock in the corporation.
These shareholders had no knowledge of plaintiffs' ad-
verse claim to the lease. The assignment of the lease to
the land in controversy showing title in the corporation
was duly recorded on March 21, 1921. Clark entered into
a drilling contract with the corporation on March 23rd,
1921, and on that day had his contract recorded. He had
no knowledge, as the proof shows, of any adverse claim of
the plaintiffs to the lease. The plaintiffs were notified
by the circular that "the rig was up on the ground," and
that drilling would proceed. Clark entered upon the
performance of his contract two days after the same was
executed and continued drilling operations until he had
reached the pay sand and was about to bring in his well
when the plaintiffs instituted this action. In the mean-
time other wells in proximity to the land in controversy
were being brought in. Stock in the corporation was
issued and delivered to some of the plaintiffs as early as
March 2, 1921, and to others by March 21, 1921, and would
have been delivered to Center if, according to the secre-
tary and treasurer of the corporation, he had not asked
that the issuance and delivery be postponed for further
investigation on his part. All of the plaintiffs received
and retained the stock that had been delivered to them
until after the well had been brought in.

Now, it occurs to us that, in justice to the corpora-
tion, the promoters and other shareholders, and in justice
to Clark, who was necessarily expending large sums of
money in the performance of his contract, the plaintiffs, if
they intended to challenge the title of Clark and the cor-
poration, could have acted more promptly. With a
knowledge that others were buying stock up to March
17th, and that Clark, after March 23d, was expending
large sums of money in the belief that the title to the
lease was in the corporation, plaintiffs could not stand by
in silence until their interest in the lease by these
expenditures had been largely enhanced in value.
The plaintiffs are not estopped by what they actually did,

but rather by what they failed to do, in view of the situation confronting them. Cognizant of the circumstances under which the stock was being sold, and that Clark was spending his money, the plaintiffs speculated on the chance of having the corporation, through its contract with Clark, greatly enhance the value of plaintiffs' interests before they elected to choose whether they would remain as stockholders in the corporation or would assert their rights as adverse claimants of the lease. The plaintiffs made no protests to the president or any officers or promoters of the corporation. We are convinced that a preponderance of the evidence shows that the trustee, Wade, acted in good faith in assigning the lease to the corporation. Certain it is that the plaintiffs knew that Stewart and those associated with him in the organization of the corporation and the furtherance of the enterprise, were acting upon the assumption that the corporation owned the lease. The plaintiffs, knowing that they and others were the owners, and that Clark, who had entered into a drilling contract with the corporation, would necessarily have to expend large sums of money in the performance of the contract, should have proceeded, at least, in a reasonable time to assert their adverse claim. What is a reasonable time must be determined by all the facts and circumstances surrounding the parties.

It is a matter of common knowledge that fortunes are made and lost in oil fields over night, so to speak. A month's delay on the part of the plaintiffs to institute their action may have meant financial disaster to Clark, who was making large investments under his contract, should he fail to discover oil. While on the other hand, the plaintiffs, without any further investment on their part, had the chance of having their fortunes increased by the expenditures made by Clark. The plaintiffs waited an unreasonable length of time. Under the circumstances they were called upon to speak, and by their silence and nonaction they must be held to have acquiesced in what was done by Wade, Stewart, the corporation, and Clark. The plaintiffs had no title of record. When Wade, the

trustee, assigned the lease to the corporation and this assignment was recorded, the corporation had the record title. Inquiry by prospective purchasers of stock and by one entering into a drilling contract with the corporation would have discovered that the corporation had the record title. Therefore, the plaintiffs, after they had knowledge that the corporation had been formed, and certainly after they knew that Wade, the trustee, had transferred the lease to the corporation and that the corporation had entered into a drilling contract with Clark, were called upon to act, and prompt action upon their part was imperative. Because, while they were hesitating as to what course they would pursue with reference to the corporation, people were purchasing stock and Clark, after he had entered into the drilling contract, was consuming his substance in drilling on the property. If he failed, plaintiffs could not lose anything, but if he succeeded plaintiffs would be made much richer at his expense. The plaintiffs were on the ground, and had full knowledge of what was being done. They had an unrecorded title in the lands of which purchasers of stock and those dealing with the corporation could not know until they had asserted the same. See *Gregg* v. *Von Pheel,* 1 Wall. 274, 17 L. E. 536; also *Veile* v. *Hudson,* 82 N. Y. 32, 40, cited in *Wiser* v. *Lawler,* 189 U. S. 260.

The facts of this case differentiate it from all those cases in which it is held that "mere silence or inactivity" does not constitute an estoppel. See *Bramble* v. *Kingsbury,* 39 Ark. 131; *Fox* v. *Drewry,* 62 Ark. 316; *Simpson* v. *Biffle,* 63 Ark. 289; *Waits* v. *Moore,* 89 Ark. 19; *Davis* v. *Neal,* 100 Ark. 399. It would have been a simple matter for the plaintiffs, after they found the corporation had been organized, at once to have notified its officers and also Clark after he entered upon the contract. They could have instituted just such an action as they did institute within a few days after they discovered that Wade had assigned the lease to the corporation and that Clark was drilling on their property. Their failure to do these things constitutes a "misleading reti

cence, and an apparent acquiescence'' in, and ratification of, what the corporation, Wade and Clark had done. Their conduct places them in the attitude of saying, "We will wait and see whether the oil comes in before we disturb Clark and the corporation in their drilling operations."

This court, in the case of *Ford* v. *Abbott,* 35 Ark. 365-77, in commenting upon the doctrine of equitable estoppel, after giving certain examples of that doctrine, said: "These are but illustrations of an all-prevailing principle, extending through every branch of equity jurisprudence, which holds it fraudulent in any one to mislead another by acts, words, or *silence* when good faith and fair dealing require him to speak, to do acts, or invest money, and then assert rights with regard to the subject-matter which would be injurious to the person misled and leave him in a worse position than if he had never acted." And, in the case of *Brownfield* v. *Bookout,* 147 Ark. 555, speaking of estoppel by conduct, we said: "This doctrine rests upon the principle that if one maintains silence when in conscience he ought to speak, equity will debar him from speaking when in conscience he ought to remain silent." See other authorities cited in the above cases, and *Baker-McGrew Co.* v. *Union S. & F. Co.,* 125 Ark. 146, 150. See also 10 R. C. L. p. 694, par. 22, and *Wiser* v. *Lawler, supra.*

Applying this doctrine to the facts above stated, we have reached the conclusion that the plaintiffs are not entitled to the relief for which they prayed. But, of course, it follows from what we have said that they must be treated as stockholders in the corporation, and have their rights protected as such. The decree is therefore reversed, and the cause is remanded, with directions to dismiss the complaint for want of equity.

McCULLOCH, C. J., (dissenting). All of us agree in the conclusion that the evidence is sufficient to support the

findings of the chancellor to the effect that the purchase of the oil lease by appellees and others, and the placing of the title in the name of Wade, as trustee, was for the purpose of holding the lease for their benefit, that Wade had no authority to transfer the lease without the consent of the beneficiaries, and that his assignment of the lease was wrongful and in violation of the trust.

It is clear that the rights of Clark are not involved in this controversy, and no act or conduct of appellees should be held to bar their right to seek, as against the appellants, a cancellation of the assignment of the lease because of the fact that Clark was an innocent purchaser in accepting a drilling contract from the corporation. The contract with Clark was wrongful, so far as the corporation itself is concerned, and the corporation should not be permitted to shield itself behind the rights of Clark as an innocent contractor.

The extent of the interest of appellees in the original lease is about twenty-four per centum of the whole, which leaves an interest in excess of a sufficiency to protect the interest of Clark, and since the corporation was a participant in the wrongdoing, the interests of appellants ought not to be affected by the rights of Clark, who, as before stated, can be protected out of the other interests.

This leaves for consideration only the question of estoppel. The majority have concluded, in the first place, that appellees are estopped to object to the assignment of the lease for the reason that they failed to protest against the organization of the corporation and the sale of stock therein for the purpose of purchasing and developing this lease.

It is not shown that any of the appellees did any affirmative act towards encouraging the sale or purchase of stock in the corporation. All that is shown is that the

corporation was organized, and that its plan for the purchase and development of this lease was advertised and stock was sold on the faith of it. The mere failure of appellees to hunt up and make protest to prospective purchasers of stock, or to publicly advertise their objections to the organization of the corporation for the purchase of the lease, did not constitute such silence or acquiescence as would amount to an estoppel.

I understand the established principles of equity to be merely that silence where one is called on to speak may work an estoppel, but before one is called on to speak there must be something done in his immediate presence which calls for action. Surely it cannot be within the principles of equity that a person is bound to run down and protest against every assertion of claim to his property made by persons not in his immediate presence. A person is not called on to speak unless he is confronted by the assertion of an adverse claim in the presence of some one who is misled by his silence in the acquisition of such claim.

In a similar case where it was sought to charge certain persons with estoppel by conduct similar to the circumstances in the present case, the Supreme Court of the United States said:

"Before holding that defendants are liable by reason of their silence, it ought to be made to appear what action they could have taken to prevent the perpetration of the fraud embodied in the prospectus and maps. If they had actually participated in it by circulating these documents, or representing them to be true, the case would have been different; but if they be held at all it must be by reason of their silence and inaction, when it is not even shown that they were cognizant of the statements contained in them. * * * But, conceding that they were fully apprised of their contents, what action were

they bound to have taken? They could not give notice to the hundreds of thousands to whom the prospectuses were sent, since they were not even apprised of their names or addresses. A notice to the company not to send out these propectuses would have been equally futile, in case the directors chose to disregard it, since they could not control their action, nor could they have sustained a bill for injunction, since they could have shown no personal injury to themselves by reason of the action of the promoters." *Wiser* v. *Lawler,* 189 U. S. 260.

In discussing the same principle this court, in the case of *Bramble* v. *Kingsbury,* 39 Ark. 131, said:

"If not already estopped, it would, perhaps, not have been required of appellant, upon being informed of the negotiations with Crapp, that he should seek him out and advise him of the encroachment. All that equity requires is, that a person shall do no act, nor be guilty of any misleading reticence, or apparent acquiescence, by which another may be entrapped into a transaction which he would have entered upon, if he had been advised of the objection. For instance, if one stands by, when he should assert his claim, and *by that* induces a purchaser to believe he has none, he will be estopped. But a mere knowledge that a third person is about to purchase does not of itself impose upon the owner of an equity the duty of seeking him out, and advising him against it."

The same rule has been announced in other decisions of this court. *Waits* v. *Moore,* 89 Ark. 19; *Westmoreland* v. *Plant,* 89 Ark. 147; *Davis* v. *Neal,* 100 Ark. 399; *Brownfield* v. *Brookout,* 147 Ark. 555; *Imboden* v. *Talley,* 150 Ark. 567.

Appellants had a right to organize a corporation for the purpose of taking over this particular lease or any other property, and to sell stock in the corporation upon representation of the intention to do so, but the mere

fact that it advertised the intention of acquiring the lease does not estop appellees from disputing the authority of Wade to assign the lease merely because they failed to take any action to prevent the consummation of this plan. They had no notice that Wade intended to assign the lease without obtaining their consent, and were given no opportunity to assent or dissent.

It is next insisted that appellees were estopped by accepting stock in the corporation. The answer to this is that they refused to accept the stock.

The majority conclude, finally, that appellees were also estopped by remaining inactive too long after the assignment of the lease by Wade before instituting the present action. It is remembered that the lease was transferred by Wade to the corporation on March 21, 1921, and two days later the corporation entered into the drilling contract with Clark. Some of the appellees were absent from El Dorado at that time, and one of them, Center, did not reside there at all. It was several days thereafter before they ascertained, or could have ascertained, that the lease had been wrongfully assigned by Wade to the corporation, and they at once began negotiations with the officers of the corporation looking to an adjustment of the controversy. The suit was instituted on April 22, 1921, so there was a delay of about three weeks in the commencement of the the action after it could have been commenced. In the meantime, the proof shows that there were negotiations pending between the parties for an adjustment of the controversy. There was not the slightest change in the attitude of any party to this controversy between the time of the assignment of the lease by Wade and the commencement of this action. There is no proof that a single dollar's worth of stock was sold during that time, nor did any of the appellees change their attitude in any respect whatever.

Mere delay in the assertion of a right never operates as an estoppel, but it is only unreasonable delay which works a disadvantage to some other person that can be pleaded in bar of the assertion of a right. This principle has been announced here so often that it is scarcely necessary to cite authorities in support of it, and only a few of the cases on that subject need be mentioned. *Fox v. Drewry,* 62 Ark. 316; *Rhodes v. Cissel,* 82 Ark. 367; *Jett v. Crittenden,* 89 Ark. 349; *Frazer v. State Bank of Decatur,* 101 Ark. 135; *Cook v. St. L. I. M. & So. Ry. Co.,* 103 Ark. 326.

It must be conceded that the business of prospecting for oil is highly speculative, and that things move very rapidly in the oil game, but it seems to me that it is carrying the doctrine of estoppel too far to say that a group of individuals against whom a wrongful act has been committed in the unauthorized assignment of an oil lease should be estopped by a delay of three weeks from the assertion of a remedy against such wrongful act, there being no change whatever in the attitude of any of the parties during the period of the delay, and there being negotiations, or, at least, efforts, pending for the adjustment of the controversy without a lawsuit.

It seems to me that the court has made a misapplication in the present case of the just and wholesome doctrine of estoppel, and my conclusion is that the decision of the chancellor is correct and that it ought to be affirmed.

I am authorized to say that Mr. Justice HUMPHREYS concurs in the views which I have expressed.