JOHNSON *v.* LION OIL COMPANY.

4-9065                                              227 S. W. 2d 162

Opinion delivered February 27, 1950.

*J. Bruce Streett* and *Keith & Clegg,* for appellant.

*Davis & Allen,* for appellee.

GEORGE ROSE SMITH, J.  In April, 1947, A. B. Turner and Walter Keith owned the leasehold interest in oil and gas leases upon 120 acres of land.  They made an oral contract with the appellants, Johnson and Stewart, by which the appellants agreed to drill oil wells on the property in return for a half interest in the leasehold estate.  The appellants were experienced in drilling oil wells but were not qualified to handle the administrative and accounting procedures involved in the operation of a producing well.  For that reason they asked the appellee, Lion Oil Company, to assume half the responsibility for performance of the Turner-Keith contract.  After some negotiations the appellee agreed to this proposal, and on May 31 a written agreement was entered into by the appellants, the appellee, and Turner and Keith.

Within the next few months five producing wells were brought in.  On November 29 the appellee bought the remaining half interest held by Turner and Keith, for $56,000.  In this suit the appellants contend that under the contract of May 31 they and the appellee were

joint adventurers—a fiduciary relationship. It is urged that the appellee was precluded from buying for itself the outstanding interest in the subject matter of the joint venture and that the appellants are entitled to share in the appellee's purchase upon payment of their half of the amount paid to Turner and Keith. The appellee meets this argument by insisting that the parties are tenants in common rather than joint adventurers and that in any event the appellants are barred by laches. The chancellor rejected the plea of laches but held that the joint adventure was limited to the half interest acquired by the contract of May 31 and did not extend to the other half originally retained by Turner, and Keith. He accordingly dismissed the appellants' complaint.

The problem presented arises from the terms of the May 31 contract and from the actions of the parties to that contract. The instrument provided that within thirty days the appellants and the appellee would begin drilling a well and would diligently carry it to a specified depth. If the well proved to be a dry hole the appellants and the appellees were required to bear the entire drilling expense. If, however, production of oil were attained, Turner and Keith were bound to pay half the drilling expense, and thereafter the oil would be divided equally between Turner and Keith on the one hand and these litigants on the other. Not only were the present litigants required to risk the expense of drilling the first well; they bound themselves either to continue the development of the leasehold at their own risk or to surrender any undeveloped acreage to Turner and Keith.

The first five wells were producers. In early November, J. E. Howell, a vice president of the appellee, telephoned appellant Johnson and said that Turner and Keith had indicated some desire to sell their half interest. Howell asked Johnson to let the appellee know if either of the appellants heard anything more about a possible sale, and Howell promised in turn to keep the appellants informed, saying, "If anything further develops I will get in touch with you." Johnson agreed to

this suggestion. The appellants then went to a bank and arranged for a $55,000 loan to be ready to pay their share if the sale should materialize. Nothing else occurred until November 29, when the appellee bought the Turner-Keith interest without notice to the appellants. Thereafter the appellants insisted that they were entitled to share in the purchase and eventually brought this suit to compel the appellee to let them participate.

As to the half interest originally acquired by the contract of May 31, the chancellor rightly held that these litigants were joint adventurers. By that agreement they joined forces in an extremely hazardous undertaking. Should any well prove unproductive they were equally bound to share drilling expenses that are conceded to have been about $32,000 for each well. But should the venture be successful, large profits were to be expected.

The appellee's contention that the parties were tenants in common is based principally upon our decision in *State ex rel. Atty. Gen.* v. *Gus Blass Co.*, 193 Ark. 1159, 105 S. W. 2d 853, where we said that the elements of a partnership must be present in a joint adventure. The appellee points to various provisions in the May 31 contract that are thought to be inconsistent with a true partnership, such as a clause that the parties' interests shall be assignable, a clause that their liability shall be several rather than joint, etc. We do not find this line of reasoning persuasive. To begin with, we did not say in the *Gus Blass Co.* case that a joint venture must contain every element of a partnership, for then there would be no difference between the two. What we said was that a joint adventure is "in the nature of a partnership of a limited character," and we then examined the agreement in question to determine whether it was sufficiently similar to a partnership to constitute a joint adventure.

But even accepting the partnership analogy we doubt if the clauses relied on by the appellee, if placed in a true partnership agreement, would be fatal to the relation of partners. The conception of a partnership, both at common law and under the Uniform Partnership

Act, is not rigid but flexible. It covers a wide variety of business enterprises and allows the partners some leeway in drawing their agreement. The Act defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." Ark. Stats. 1947, § 65-106. As long as the agreement creates the basic structure of a partnership, we think the parties may insert details that would be treated differently by the Act in the absence of the contractual provisions. Take, for example, the clause in the present contract that makes the interests assignable. We find nothing in the Uniform Act that transforms a partnership containing a provision such as this into a tenancy in common without partnership incidents. It seems plain that the original relationship would continue to be a partnership until one partner did assign his interest. Indeed, the Act seems to recognize this view, as it contains a section setting forth the rights of the assignee of a partner's interest. § 65-127. The same thought applies to the other clauses stressed by the appellee. Those clauses guard against certain contingencies, but until those contingencies arise we think the joint adventure continues to exist. Thus the appellants were not required to see that the agreement complied precisely with the Uniform Act as a condition to reliance upon the honesty and good faith of their coadventurer. The relationship itself justified them in assuming that the appellee would conform to the standard expected of a fiduciary, regardless of precautionary provisions that the attorneys put in the contract.

The next question is whether the obligations of this joint adventure extended to the outstanding Turner-Keith interest. This issue has given us much concern, although our task has been lightened by the complete candor with which the witnesses testified and by the unusual excellence of the briefs. Without here reviewing the many authorities cited, we adopt the view expressed by the majority in *Meinhard* v. *Salmon,* 249 N. Y. 458, 164 N. E. 545, 62 A. L. R. 1. There Salmon had obtained a valuable 20-year lease upon hotel property, with a provision that as lessee he would make ex-

tensive alterations in the building. Salmon persuaded Meinhard to contribute capital to the venture in return for roughly a half interest in the lease. Salmon was to be the managing partner in the venture, which proved to be highly profitable. When the lease was about to expire the lessor offered to Salmon a new lease upon the hotel and upon much additional property. Salmon took the new lease for his own benefit without notice to his coadventurer. The court held that Meinhard was entitled at his option to share in the new lease. In language familiar to every student of law CARDOZO, C. J., said: ''Joint adventurers, like co-partners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor. the most sensitive, is then the standard of behavior. . . . The pre-emptive privilege, or, better, the pre-emptive opportunity, Salmon appropriated to himself in secrecy and silence. He might have warned Meinhard that the plan had been submitted, and that either would be free to compete for the award. . . .The trouble about his conduct is that he excluded his coadventurer from any chance to compete, from any chance to enjoy the opportunity that had come to him alone by virtue of his agency. This chance, if nothing more, he was under a duty to concede. The price of its denial is an extension of the trust at the option and for the benefit of the one whom he excluded. . . . A managing coadventurer appropriating the benefit of such a lease without warning to his partner might fairly expect to be reproached with conduct that was underhand, or lacking, to say the least, in reasonable candor, if the partner were to surprise him in the act of signing the new instrument. Conduct subject to that reproach does not receive from equity a healing benediction.''

The parallel in the instant case is almost exact. It is true that the appellee did not act wholly in secret; its conduct no doubt complied with an average standard

of practical honesty. But the appellee was a fiduciary and had agreed to keep the appellants informed of its progress in attempting to acquire the Turner-Keith interest. Of course the statute of frauds is a bar to the enforcement of that promise if treated as a contract to sell an interest in land, but it does illustrate the complete confidence that existed. With that assurance there was no occasion for the appellants to do anything more than to prepare themselves to share in the purchase; common sense indicated that the coadventurers should not compete with each other in the bidding. Howell was out of the city on November 29 and did not attend to the actual purchase, but we feel sure that he would have been subject to reproach, as CARDOZO put it, had he been surprised in the act of purchasing the outstanding interest. That prick of conscience—or a sense of good sportsmanship, as the chancellor expressed it—pretty well indicates to a fiduciary that he is going beyond the limits permitted.

We agree with the chancellor's rejection of the plea of laches. Not later than February 12, and perhaps earlier, the appellants first asked to share in the purchase. The suit was brought within ten months after November 29. Two circumstances are relied upon to show that even this delay was too long. First, the price of crude oil rose about 25% on December 7, eight days after the purchase. An advance in price had been announced in Texas on November 27, however, and it is not unreasonable to assume either that a similar rise would follow in Arkansas or that the Texas price would have to be reduced to meet competition. In any case, however, the appellants were entitled to a reasonable time in which to decide whether it was wise to demand a share in the newly purchased interest. The appellee was keeping the records of production and was in a more favorable position to know what the Turner-Keith interest was worth. We do not think that an increase in value that took place while the appellants were determining the wisdom of the purchase should be charged against them on the score of laches.

Second, a sixth producing well was drilled about a month before suit was brought. In some instances we have held that even a very short delay may be fatal when values fluctuate as rapidly as they do in oil fields. In *Stewart Oil Co.* v. *Bryant,* 153 Ark. 432, 243 S. W. 811, a delay of only thirty-two days was too long. But here the sixth well was not a wildcat venture in which success multiplied the value of the property overnight. Five wells had already been productive, and it is evident that the sixth had good prospects of success. No doubt the last well did add some value to the leasehold, but we do not think the proportionate increase was so great as to be of decisive importance on the issue of laches.

Reversed.

GRIFFIN SMITH, C.J., dissents.