## DAVIS *v.* HARRELL.

## Opinion delivered December 11, 1911.

1. LACHES—ACQUIESCENCE.—Equity will refuse its aid where a party has slept upon his right and acquiesced for a great length of time. (Page 235.)

2. ADVERSE POSSESSION—NOTICE.—Where a father procured a deed to be made to his infant daughter, and remained in possession of the property for ten years when he became estranged from the daughter and thereafter procured a deed to be executed to his sister, placed same upon record, and thereafter openly held the property in his sister's right, his conduct amounted to a repudiation of the daughter's claim. (Page 235.)

3. LACHES—ACQUIESCENCE.—Where, after a father procured a deed to be made to his daughter, he separated and became estranged from her, and openly repudiated her ownership, and she waited for 13 years after she became of age before seeking to establish her title in equity, she will be held to be barred by laches. (Page 237.)

4. SAME—ACQUIESCENCE.—Where, after a father procured deed to be executed to his daughter, he became estranged from her and repudiated her ownership, and acquired another title, and held it for many years, and made valuable improvements thereon, within the daughter's knowledge, and subsequently conveyed to innocent purchasers, and thereafter died, whereupon the daughter sued in equity to establish her title, she will be held to be barred by laches. (Page 238.)

5. TRIAL—WRONG FORUM—WAIVER.—One who sues in equity can not on appeal object that the action should have been in a court of law. (Page 238.)

Appeal from Garland Chancery Court; *A. Curl*, Chancellor; reversed.

*Rector & Sawyer*, for appellants.

The plea of laches should have been sustained, for that plea is conclusive in this court. Appellants purchased for a valuable consideration without any actual knowledge of appellee's rights. The door of courts of equity can not remain open forever, and refuse relief where a party has slept upon his rights, and acquiesced for a great length of time. 55 Ark. 85; 3 Brown, Ch. 640; 145 U. S. 368; Kirby's Digest, § 657. 80 Ark. 411; 76 *Id.* 146; 77 *Id.* 324; 58 *Id.* 85; 20 Mo. 541; 53 Fed. 875; 46 Ark. 34; 61 Ark. 587; 36 S. W. 333; 79 N; W. 89. The facts in this case were sufficient to put appellee upon notice.

*James E. Hogue*, for appellee.

1. Appellants were not innocent purchasers for value and without notice.

2. The statutes of limitation only apply to cases at law strictly, and no laches is shown. There was never any renunciation or repudiation by the trustee, nor any act of hostility to put the ward on notice. A trustee can not acquire any interest in the trust property adverse to his *cestui que trust.* 42 Ark. 25; 30 *Id.* 44; 26 *Id.* 445; 23 *Id.* 622; 20 *Id.* 381; 33 *Id.* 575; 26 *Id.* 445; 8 Wheat, 421; 6 *Id.* 481; 10 Peters, 269.

3. The possession by a trustee is that of his *cestui que trust,* and no lapse of time is a bar, unless there is an open repudiation or renunciation. 48 Ark. 297; 38 *Id.* 494; Perry on Trusts, §§ 920-1-2; 38 Ark. 494; 22 Ark. 5-6; 28 *Id.* 19; 48 *Id.* 248. No length of time is a bar in case of an express trust. Perry on Trusts, § 863. Hostility to a trust must be shown beyond doubt. *Ib.* § 364; 74 Ala. 547.

*C. Floyd Huff,* for appellants.

Appellants were innocent purchasers for value. 72 Ark. 83; 72 *Id.* 299; 145 U. S. 492.

McCULLOCH, C. J. Appellee, Mary E. Harrell, is the daughter and only child of Col. John M. Harrell, deceased, of Hot Springs, Arkansas, and she instituted this action in the chancery court of Garland County against appellants, who were grantees of her father, to establish her title to and recover possession of certain real estate situated in that city. She was about 31 years of age when she instituted the action on September 4, 1908, and her father died on July 4, 1907, after having conveyed the property in controversy to George R. Belding and H. R. Morrison, who, in turn, conveyed it to one Shevlin, who conveyed to appellants, Sam J. Davis and wife. Col. Harrell purchased the property from one Carter Brutus in the year 1878, when appellee was an infant of tender years, and, as a gift or advancement to his daughter, he caused the conveyance to be made to her by Brutus. He built on the lot a large and comfortable residence, with outhouses, out of his own means, and he and his wife and child occupied it as a home. Carter Brutus occupied the lot, or a portion of it, at the time of his said conveyance to appellee, but the title was in the United States, and was subsequently patented to him by the Government on May 10, 1882. In December, 1884, Brutus executed

another conveyance to one Mary Goff, who a few days later reconveyed to Amelia Brutus. An estrangement grew up between Col. Harrell and his wife, appellee's mother, which resulted in a separation. Mrs. Harrell left home in the year 1888, and went to the State of Tennessee, taking the child with her, and they never returned. Col. Harrell continued to occupy the property as a place of residence until he sold it to Belding and Morrison in the year 1903. Mrs. Harrell obtained in the courts of Tennessee a decree of divorce, and in 1892 married one J. H. Thompson. Col. Harrell also obtained a decree of divorce in the chancery court of Garland County about the time of his wife's intermarriage with Thompson. The estrangement between Col. Harrell and his wife and daughter was complete. He did not communicate with either of them after Mrs. Harrell's intermarriage with Thompson, and never thereafter contributed anything to their support. The last communication shown positively by the record was a letter from him to appellee dated January 30, 1891, in which he enclosed a remittance of $35 to pay for her board. This letter disclosed the strained relations between father and daughter, though she was only 14 years of age at that time. She testifies that she wrote to him after that time, but received no response, and that she never thereafter saw him or heard from him. She testified that she resented her father's attitude of hostility toward her mother, and lost all affection for him. She took the name of Thompson, and bore that name ever afterwards, which, of course, incensed her father very greatly, and added fuel to the flame of his indignation. Before that time Mrs. Harrell had caused a slight change to be made in appellee's name at her christening from what Col. Harrell had intended it to be, and he seems to have laid considerable stress upon this wrong which he conceived had been done him. Shortly after the separation, Col. Harrell's maiden sister, Mary E. Harrell, came to live with him as his companion and housekeeper, and they resided together at the dwelling house on the property in controversy until Miss Harrell's death in April, 1901. On March 8, 1892, Amelia Brutus, the wife of Carter Brutus, executed to Mary E. Harrell, Col. Harrell's sister, a deed purporting to convey to her the property in controversy. This conveyance was properly placed of record,

and from that time up to her death Miss Harrell claimed the property as her own.   It was assessed and insured in her name, and listed in her name for sale with real estate men.   Miss Harrell died intestate, leaving Col. Harrell and another sister, Mrs. Ellen H. Cantrell, as her only heirs at law, and Mrs. Cantrell shortly after Miss Harrell's death, executed to Col. Harrell a deed conveying all her interest in the property.   The testimony shows conclusively that Col. Harrell never treated the property as his daughter's after she and her mother left him.   On the contrary, he treated it as his sister's property up to the time of her death and as his own after that time. He mortgaged it for $2,100 borrowed money, and improved it by building thereon several cottages for rent.   In September, 1901, after the death of his sister and the execution of the deed to him by his other sister, Mrs. Cantrell, he filed a complaint in the chancery court of Garland County, under the act of March 28, 1899, to confirm and quiet his title to the property, claiming title thereto under the conveyance to his sister by Amelia Brutus and also claiming title thereto by adverse possession for the statutory period of seven years.   He set forth in his complaint the history of the conveyance by Carter Brutus to his daughter, and also that it was intended by him as an advancement to his daughter, but that she had completely abandoned him and disowned him as her father, and had taken another name, and he asserted the right to revoke the advancement.   He named her as a defendant in the action, and asked that her title be divested.   Notice of the pendency of the proceeding was duly published in accordance with the provisions of said statute.   That proceeding resulted in a decree in accordance with the prayer of said petition, confirming and quieting the title of the petitioner.   Appellants filed separate answers, setting forth the facts hereinbefore recited, and pleading that they are innocent purchasers of said land for value without notice of appellee's claim, that she is barred by her laches from asserting any claim to the property, that she is also barred by the seven years' statute of limitations, and that the decree of the chancery court in the confirmation suit of Col. Harrell was a final adjudication which barred appellee's right to recover. They also filed a plea to the jurisdiction of the chancery court in this action, which was overruled.

The court, on final hearing of the cause, rendered a decree in favor of appellee, establishing her title to the property, and awarding possession thereof except as to certain portions which did not fall within the description in the deed from Carter Brutus to her.

We shall discuss only the plea of laches, for we are of the opinion that that plea is conclusive in this case. Appellee is barred by her own laches from asserting her claim against appellants, who purchased the property for a valuable consideration, without any actual knowledge of her rights. She had been absent for twenty years, of which thirteen years accrued after she attained her majority, without asserting any claim to the property, though she knew that it belonged to her, and that her right of action to recover the same was complete. During all that time her father was in possession, using it and openly and notoriously claiming it as the property of his sister, and, after the latter's death, as his own. She knew this, or, at any rate, she had every reason to believe it. She says she heard about his building cottages on the lot for rent She admits that she and her mother employed attorneys in Nashville, Tennessee, many years ago to investigate the record in Garland County to procure evidence of her title to the property in controversy. There was a complete and final separation of father and daughter. She had abandoned him for good, and knew that he had renounced her as his daughter. The attitude of each towards each other was one of the utmost hostility, and they made no further claim to each other's affection. She states in her testimony that her feeling of resentment toward her father was so pronounced that if she had heard that he was in a dying condition she would not have gone to him. She says she thought he was holding the property and looking after it for her, but she had no right to think so under the peculiar circumstances of this case. In fact, her admission that she and her mother had got attorneys to inquire about the title shows that she was suspicious of her father's conduct with respect to this property, and had reason to believe that his continued possession was hostile to her rights. When she heard that her father was placing valuable improvements upon the property, she had no right to assume that he was doing this for her benefit, and as a further advancement to

her; for at that time her father had long since ceased to contribute to her support, though it had become necessary for her to support herself by her own efforts. There is evidence also that, very soon after her father sold the property to Belding and Morrison in 1903, she learned of it, and yet she remained inactive, permitting those parties to resell to others, who were innocent of any knowledge of her claim. The familiar rule on this subject is statued thus:

"Courts of equity have always discouraged laches and delay. The door of equity can not forever remain open." *Gibson* v. *Herriott*, 55 Ark. 85. In that case Judge BATTLE quoted with approval the following words of Lord Camden in *Smith* v. *Clay*, 3 Brown's Ch. Rep. 639:

"A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his right, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith and reasonable diligence; where these are wanting, the court is passive, and does nothing. Laches and neglect are always discountenanced, and therefore, from the beginning of this jurisdiction, there was always a limitation to suits in this court."

Mr. Justice Brown of the Supreme Court of the United States, speaking for that court as to the equitable doctrine of laches, said:

"The cases are many in which this defense has been invoked and considered. It is true that, by reason of their difference of facts, no one case becomes an exact precedent for another. Yet a uniform principle pervades them all. They proceed on the assumption that the party to whom laches is imputed has knowledge of his rights, and an ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless, or have been abandoned; and that, because of the change in conditions or relations during this period of delay, it would be an injustice to the latter to permit him to now assert them." *Galliher* v. *Cadwell*, 145 U. S. 368.

The fact that the possession of Col. Harrell began while the parental relation subsisted raised a presumption that this

relation controlled his action, and that his possession was in subordination to the title of his daughter. *Waits* v. *Moore*, 89 Ark. 19. But his possession continued long after that relation came to an end in fact, and continued in hostility for so long a time as to overcome that presumption. He held possession at first as trustee for his daughter, but his subsequent conduct amounted to an open repudiation of the trust.

"Notice of facts and circumstances which would put a man of ordinary intelligence and prudence on inquiry is, in the eye of the law, equivalent to knowledge of all the facts a reasonably diligent inquiry would disclose. Whatever is notice enough to excite attention, and put the party on his guard, and call for inquiry, is notice of everything to which such inquiry might have led." *Percy* v. *Cockrill*, 53 Fed. 872.

In *Singer* v *Naron*, 99 Ark. 446, we said:

"In order for the possession of one tenant in common to be adverse to that of his cotenants, knowledge of his adverse claim must be brought home to them directly or by such notorious acts of an unequivocal character that notice may be presumed."

The rule is that the trustee is presumed to hold the trust estate in subordination, and not in hostility, to the rights of the *cestui que trust*, and he can not plead lapse of time in bar of the latter's rights, but it is equally well settled that a repudiation of the trust sufficient to bring home notice of his hostile claim to the other party will set the statute of limitations in motion. *McGaughey* v. *Brown*, 46 Ark. 26; *Gibson* v. *Herriott*, *supra;* *Thomas* v. *Sypert*, 61 Ark. 575; *St. Louis & Ark. Lbr. Co.* v. *Godwin*, 85 Ark. 372; *Stuckey* v. *Lockard*, 87 Ark. 232.

Judge RIDDICK, delivering the opinion of the court in *Thomas* v. *Sypert*, *supra*, said:

"The fact that Sypert was the administrator of the estate of appellant's father, and also stood *in loco parentis* towards appellant, can now avail nothing, after so great a lapse of time; for, by the purchase and adverse possession of the land, Sypert had, so far as it was concerned, openly repudiated the trust. The rule is that 'the statute begins to run from the time that the trust is openly repudiated or disclaimed by the trustee.' " This was said as to the statute of limitations, but its applica-

tion is stronger to the plea of laches in the assertion of an equitable title.

In addition to the facts already referred to, there is another feature of the case which we think, in the interest of justice, strongly calls for the application of the doctrine of laches. There is reason to believe, from the conduct of Col. Harrell and his statement to others that he claimed the right to revoke the gift or advancement to his daughter, that he disregarded it and held the property as that of his sister and as his own, and that he had so notified appellee and her mother. We can not consider those matters further than to take them as suggestions that if Col. Harrell were now alive he could adduce proof upon which he and his grantees could make good his claim of adverse possession which he asserted in his confirmation suit. Now that he is dead, and that his mouth is closed as a witness, it adds another reason why appellee's claim should not be sustained at this time.

The loss of testimony is a material circumstance in enforcing the equitable doctrine of laches. This principle is illustrated in the case of *Dickson* v. *Sentell*, 83 Ark. 385. In that case G. W. Sentell, a wealthy merchant of the city of New Orleans, was a creditor to a large amount of his brother-in-law, David E. Dickson, a planter and land owner in Lafayette County, Arkansas. During the life of the mortgage the land was sold under execution for a small amount and purchased by another person, who transferred the certificate to Sentell, and a sheriff's deed was executed to him. The mortgage was never foreclosed, and Sentell rested upon his legal title under the execution sale. Both of the parties lived for many years afterwards, Dickson still remaining in possession of the property but recognizing Sentell's rights by paying rent to him. After the death of both, the heirs of Dickson sought, in a court of equity, to have the widow and heirs of Sentell held to be trustees; but this court decided against them on the ground of laches, and Judge RIDDICK, in disposing of that question, said:

"Neither laches nor the statute of limitations was set up as a defense in this case, the defendant simply denying most of the material allegations of the complaint. But, though laches was not pleaded, still this long delay must be considered. It lasted until Sentell and Dickson, the two principal actors in

the transactions upon which this suit is based, and who probably alone fully understood them, were both dead. After a delay that has sealed the mouths of these two most important witnesses, a court of equity ought not to set aside this deed unless clearly satisfied that the interest of justice require it and that Dickson had no notice of the adverse claim of the Sentells to his land until shortly before his own death."

Upon a careful examination of the whole record, we are convinced that the evidence abundantly shows facts which were sufficient to put appellee upon notice of her father's hostile claim to the land, and that she was in fact possessed of sufficient actual knowledge of his conduct with respect to the property to put her upon notice and call for action upon her part. Her passiveness, though the situation called for action, has involved innocent parties, and, upon settled principles of equity, she can not demand relief against them in a court of conscience.

It is unnecessary for us to pass on the question whether the court of chancery should have entertained jurisdiction of the cause or transferred it to a court of law. Appellee having selected the forum and voluntarily invoked the aid of the chancery court, she can not complain that the action should have been in a court of law. *Cribbs* v. *Walker*, 74 Ark. 104.

The decree of the chancellor is therefore reversed, and the cause is remanded with directions to enter a decree dismissing the complaint for want of equity.