CARTIER *v.* HENGSTLER.

Opinion delivered November 24, 1924.

1. LIMITATION OF ACTIONS—SUSPENSION BY FRAUD.—Fraud in obtaining the title to land will not suspend the operation of the statute of limitations against an action to set aside the title any longer than it is concealed from the plaintiff's knowledge.
2. EQUITY—LACHES.—A party who sets up a fraudulent misrepresentation of fact as a ground of relief or defense in equity must not be guilty of laches.

Appeal from Ouachita Chancery Court, Second Division; *George M. LeCroy,* Chancellor; reversed.

*Gaughan & Sifford,* for appellants.

1. The parties were tenants in common, not partners nor joint adventurers in the purchase and sale

of the lands in controversy, and, such being the case, appellee had no cause of action. Appellee cannot contend that there was a written agreement between him, Rath and Cartier, that neither of them should sell or dispose of his interest in the lands without the consent of the others, and an oral agreement to that effect would have been void as in violation of the statute of frauds. C. & M. Dig., § 4862. Before the purchasers would have become partners or joint adventurers, there must have been some agreement, either expressed or implied, to do something more than merely to purchase the lands. As to joint adventures and limited partnerships, see 27 N. Y. Supp. 285; 101 N. Y. Supp. 22; 30 Cyc. 751-752; 23 Cyc. 453. The facts in this case do not create the relationship of partners any more than the facts in the case of *Pumphreys* v. *Furlow,* 144 Ark. 219. See also 97 Ark. 390; 91 Ark. 26.

2. Appellee's allegation that Lucy Rath is not an innocent purchaser, that the conveyance by her and the German Lutheran Synod to Cartier, and by the latter to her, were without consideration, and was merely a scheme to place title in her, is denied by the appellant, and the burden therefore is on the appellee to prove by a clear preponderance of the evidence that she is not an innocent purchaser. 35 Ark. 100; 4 Ark. 296; 132 Ark. 158; 39 Cyc. 1785, 1786; 23 Ark. 735.

*James F. Lawrence, C. W. German,* and *Lee C. Hull,* for appellee.

If the parties were mere tenants in common, which is denied, that would not be any justification for practicing upon Hengstler a fraud such as the record discloses. These parties were, however, joint adventurers, as is amply supported by the following authorities: 88 Ark. 373, 114 S. W. 714; 36 Nev. 623; Am. Cases, 1916A, 1202; 121 Minn. 192, 141 N. W. 108; 65 W. Va. 493; Am. Cases 1018, and note: 146 Wis. 130, 131 N. W. 339; 133 N. W. 288; 110 Pac. 705; 68 W. Va. 317, 69 S. E. 1000; 47 W. Va. 63; 15 R. C. L. 500-508; 27 N. Y. Supp. 785. The

contention that the heirs or legatees of William Rath could take title to, or an interest in, these lands, as innocent purchasers for value, under the facts in evidence, is not worthy of consideration. See to the contrary 121 Minn. 192, 141 N. W. 108, Am. Cases 1914C 689; 78 N. J. Eq. 270, 79 Atl. 419; 122 N. Y. S. 680. Differing materially from a partnership, the rule as to co-adventures is that it is not necessary to prove a partnership agreement, but the only prerequisite is that the individuals associate themselves together for a common purpose for their common good. 152 N. W. 43. And the co-adventurers are bound to exercise the highest degree of good faith toward one another. 227 S. W. 370; 76 N. J. Eq. 592; 74 Atl. 130; 27 Wyo. 423, 200 Pac. 96; 117 Minn. 235, 135 N. W. 820; 130 Minn. 450, 153 N. W. 874; 212 N. Y. 507, 106 N. E. 321; L. R. A. 1915B, 160; 194 Fed. 577. The law not only exacts the utmost good faith, but it also forbids the accrual of any profit or advantage to one member of the adventure that is not shared by all. 165 Ia. 703; 194 Fed. 534; 121 Minn. 192; 152 N. W. 43; 212 N. Y. 507, 106 N. E. 321, L. R. A. 1915B, 160. A joint adventurer has the right to assume that his co-adventurer has acted in good faith in reporting the cost or sale of property, and is not chargeable with negligence if he relies on the latter's statements. 165 Ia. 703, 147 N. W. 164. He may recover from his associates secret commissions or rebates on purchase price retained by them, his proportionate share. 28 S. Dak. 239, 133 N. W. 288; 36 Nev. 623, 134 Pac. 461, 50 L. R. A. (N. S.) 1046; 78 So. 160. A joint adventure cannot be terminated at the will of a member. If no date is fixed for the joint adventure's termination, the agreement remains in force until its purpose is accomplished. 152 N. W. 43; 60 So. 591; 155 N. Y. S. 230. Where an agreement is made for the purchase and sale of real estate, it is not material whether the title is taken in the name of one adventurer or all. If it is taken in the name of one or more of the adventurers, it

is impressed with a trust for the benefit of the joint adventurers and so continues until it passes into the hands of a *bona fide* purchaser. 121 Minn. 192, 141 N. W. 108; 117 Minn. 235, 135 N. W. 820. Where an enterprise has been launched and contributions made by parties who subsequently become delinquent, active steps to determine the undertaking must be made by those not in default, to exclude the delinquents from further participation, if it is intended to deny their right to share in the subsequent profits. 67 So. 591; 202 Ill. App. 563; 72 So. 365; 81 W. Va. 1, 94 S. E. 388; 129 Wis. 524, 109 N. W. 576.

WOOD, J. On the 24th of February, 1921, the plaintiff below (appellee here) instituted this action in the chancery court of Ouachita County against the defendants below (appellants here). The appellee alleged that all parties to the action were residents of Ludington, Mason County, Michigan. The appellee seeks to recover a one-third interest in about four thousand acres of land situated in Ouachita County, Arkansas, about three thousand of which he alleged in his complaint were purchased by himself, Warren A. Cartier and William Rath, all of the city of Ludington, Michigan, under parol partnership agreement entered into between them in January, 1902, for the purpose of purchasing the lands, and that about one thousand acres were purchased by Cartier and Rath in their own names. The lands are described in the complaint. The appellee alleged that on the 5th of June, 1912, Cartier and Rath, with the intent to defraud the appellee, negotiated a sale of the timber on the lands with one T. S. Grayson of Magnolia, Arkansas, for the sum of $95,000. Cartier represented to the appellee that, on the 12th of June, 1912, he had received an offer of $67,500 for the lands; that Cartier and Rath made representations to the effect that the partnership would receive a good profit by accepting the offer, and that, if they failed to accept it, it would result in a great loss, because the price of the timber would go down, and it was subject to be destroyed by fire, which representations Cartier and

Rath knew to be false, and that they were made for the purpose of misleading the appellee; that the appellee had no special knowledge of the timber and lands, and relied upon these representations of Cartier and Rath, and joined with them in the execution of a deed to T. J. Gaughan for the express consideration of $67,500, which deed bore date of June 12, 1912, and was duly recorded June 17, 1912; that on June 12, 1921, Gaughan reconveyed the lands to Cartier for an alleged consideration of $95,000, which deed was also recorded on June 17, 1912; that on June 24, 1912, Cartier conveyed to Rath an undivided half interest in all the lands for the consideration of $47,500, which deed was recorded July 3, 1912; that the sale of the timber by Cartier to Grayson, negotiated on June 5, was finally consummated and the deed executed for the same on June 26, 1912, which deed, at the request of Cartier and Rath, Grayson did not have recorded; that, after these transactions, Rath died, September 13, 1916, and appellant Ostendorf was named as executor of his will; that the will devised Rath's interest in the lands to the German Lutheran Synod of certain States, subject to a life estate in his wife; that these lands were conveyed by the synod and his wife to Cartier on July 18, 1918, and Cartier, on the 8th of August, 1918, conveyed an undivided half interest to Lucy Rath for the alleged consideration of $5,000, all of which deeds were duly recorded in Ouachita County; that Cartier deliberately misled the appellee by representing that all the lands described in the complaint were to be included in the deed to Gaughan, whereas some 1,000 acres which had been purchased in the name of Cartier and Rath were not included in the deed, but were conveyed in a separate deed to Gaughan for an alleged consideration of $27,500 on June 12, 1912, which deed was also recorded on June 17, 1912. The appellee further alleged that he had no knowledge of the circumstances surrounding the conveyances to Gaughan and the negotiations for sale of the timber to Grayson until these circumstances were brought to his knowledge by the rep-

rcsentatives of a certain oil company, during the latter days of September, 1919. The appellee further alleged that the title to the lands appeared in Cartier and Lucy Rath, and that they were about to sell the same, and would do so unless restrained; that they were indebted to the appellee in the sum of $5,000, balance due him from the partnership on account of the sale of the timber. Appellee prayed for an accounting of the partnership dealings and transactions, that he have his proportion of the proceeds of the sale of timber found to be partnership funds, that Cartier and Mrs. Rath be required to convey their interest in the lands, and that the lands be partitioned according to the interests of the respective parties, and that they be enjoined from conveying or incumbering the lands in any manner, and for such other and further relief as in a court of equity he was entitled to.

The appellants denied that there was any partnership between Cartier, Rath, and the appellee. They admitted the purchase of a large body of the lands in controversy by them with the appellee, but alleged that these lands were not purchased by them as partners, but were held and purchased by them as tenants in common. They alleged that the certain other lands described in the complaint were afterwards purchased by Cartier and Rath as tenants in common, in which the appellee was not interested. They denied specifically all of the allegations of the complaint as to fraud and as to the partnership. They alleged that on the 25th of May, 1912, the appellee executed an option to Cartier agreeing to convey to him an undivided one-third interest in the lands within sixty days for the price of $23,333.33, less a commission of five per cent; that, before the expiration of the option, appellee agreed to, and did, accept the sum of $22,500 for an undivided one-third interest in the lands, and agreed to pay a commission of five per cent. on the sale; that, on the 24th of June, appellee executed his receipt to Cartier in full for the sale of the lands and commission, in the sum of $21,375. Appel-

lants alleged that appellee had knowledge of all the circumstances and facts concerning the conveyance of the lands to Gaughan. They admitted the purchase of the lands by Cartier from Gaughan, and the sale of the timber by him to Grayson, and stated that said lands, after the removal of the timber, could not have been disposed of on the market for $1 per acre; that the present value is speculative, depending on the prospects for the discovery of gas and oil thereon. They denied that appellee had any interest in the lands, and denied that he was entitled to any accounting as of a partnership between appellee, Cartier and Rath. Appellants set up that plaintiff, in the year 1912, or soon thereafter, had full knowledge of the matters and things complained of in his complaint, or, by the exercise of reasonable diligence, could have had knowledge of all matters and things set forth in his complaint; and that his suit herein was not brought within three years after the discovery by him of the acts and things complained of, or within three years of the time within which, by reasonable diligence, he might have had knowledge of the matters and things complained of." There was a reply by the appellee to the answer which he asked to be taken as an amendment to his original complaint, but the allegations of which we deem it unnecessary to set forth, as the issues are sufficiently stated in the complaint and answer.

The court, after hearing the evidence, which consisted of testimony taken in open court, and which was afterwards reduced to writing, duly authenticated and brought into the record, together with various documents, which were introduced in evidence, found that the appellee was the owner of an undivided one-third interest in all the lands purchased in the names of Warren A. Cartier, William Rath and Andrew Hengstler during the years 1902 and 1903, and held by them as partners, amounting, in the aggregate, to about 3,000 acres; a decree was rendered in favor of the appellee to that effect, subject to a charge of $1,477.93 as appellee's part of the taxes and expenses incurred with reference to the lands in favor of the appellants.

This decree of the court was bottomed on the findings of fact that the lands were purchased by the appellee, Cartier and Rath, as partners and joint adventurers of appellee, and that afterward Cartier and Rath, by fraud, deceit and misrepresentation practiced upon the appellee, induced him to join with them in the sale of the lands to Gaughan, and that the subsequent conveyances of the lands by Gaughan to Cartier and by Cartier to Rath of a half interest, and by Cartier, acting for himself and Rath, of the timber thereon to Grayson, were the result of the deceit and fraud practiced upon the appellee; that the real facts with reference to these conveyances were concealed from appellee, and that he was thereby defrauded out of a one-third undivided interest in all the lands described.

From the decree of the court the appellants have prosecuted their appeal, and the appellee has cross-appealed.

The record of the testimony bearing upon the issues as to whether the lands were purchased by appellee, Cartier, and Rath, as partners or joint adventurers, and whether Cartier and Rath perpetrated a fraud upon the appellee by which he was deprived of his interest in the lands, is voluminous. But the conclusion reached by a majority of the court on the issues of the statute of limitations and laches makes it unnecessary to set out and discuss the testimony bearing upon the other issues.

It appears from the evidence that, on the 25th of May, 1912, appellee executed an instrument to Cartier, giving Cartier an option to purchase appellee's one-third interest in the 3,000 acres of land at the price of $23,333.33, less a commission of five per cent., the option to continue for sixty days. On June 12, 1912, appellee, Cartier and Rath and their wives joined in a deed conveying the lands in controversy to T. J. Gaughan for the consideration of $67,500, which deed was recorded on June 17, 1912. On June 24, 1912, appellee executed a receipt in which he acknowledged he received from Cartier the sum of $21,375 in full for the sale of lands owned

jointly by appellee, Cartier and Rath, consisting of
3,000 acres in Ouachita County.   Nearly nine years there-
fore had elapsed from the date of these transactions
which appellee claims were the result of fraud and mis-
representation practiced upon him by his partners or
associates in the joint adventure, and by which he was
induced to sell his interest in the lands in controversy.
Appellee claims and testifies that he found out that a
fraud had been perpetrated upon him soon after oil had
been discovered in that locality.   One Omar Farrell told
him about it.   This was in 1919, at which time Farrell
secured from appellee an oil and gas lease on 3,240 acres
of the lands in controversy.   Appellee also testified that
he didn't know the different ones who told him about it;
that he filed this suit when he found it out.   He was
asked, ''Did Mr. Omar Farrell get you to bring this law-
suit?'' and answered, ''He spoke to me about it; yes sir.''

The testimony of Omar Farrell was to the effect that
he told the appellee about the condition of the title in
1919.   After he procured the lease from the appellee,
he agreed with the appellee to bring this lawsuit in his
name, and that he would bear the expenses of the litiga-
tion.

Judge Tate, the agent of the appellee and of Rath
and Cartier, through whom the original negotiations for
the purchase of the lands were conducted, and who looked
after the lands for them after the purchase, in the pay-
ing of taxes, purchases, sales, etc., was asked in regard
to the sale of the lands, among other questions, the fol-
lowing:

''Q.   Did he (Hengstler) know and was he aware of
the fact that this land was going to be returned to Rath
and Cartier?   A.   He certainly did, or knew about it
afterwards; maybe he did or didn't—I don't know myself,
I didn't know myself right at the time.   Q.   You don't
know whether Hengstler knew what was being done at
the time or not?   A.   I told him that I would put his lands
in and have them sold.   Q.   The deed that Hengstler
signed showed that he was selling the land and all?   A.

Yes sir. Q. You do not know at all that he (Hengstler) had any knowledge that Rath and Cartier were to get the land back by reconveyance from Mr. Gaughan? A. If he did not know it then, he acquired that knowledge afterwards. Q. How do you know he acquired that knowledge? A. I wrote him. Q. Where is that letter? A. I don't know. Q. How many days afterwards? A. Oh, about a week, I guess. Q. That has been eleven years ago? A. Yes sir; and he wrote me a letter and bragged about that trade. Q. Where is that letter? A. I don't know. Q. You told him that Rath and Cartier were to get his land for nothing? A. I told him that he got the money and they got the land and paper. Q. You told him that Rath and Cartier got it back through Mr. Gaughan? A. Hengstler knew all about it. Q. You are testifying as strong as you can for Rath and Cartier, and you represented Hengstler? A. I treated him exactly fair—I told him we got the money, and he congratulated me. Q. You told him that all he got was one-third of the money that Rath and Cartier got for the timber? A. No sir; I told him what it sold for. Q. You told him what the land for? A. I told him they took the lands and paper and we got the money. Q. What lands? A. They got the lands back to hold with this paper as part of the security. Q. You told Mr. Hengstler that, in the different deeds here, that Rath and Cartier got as much money as he did and got the land in addition? A. Yes sir; got it all, but the consideration was that he and I get the money; he knew about that. Q. I asked you that question a while ago, and you evaded it. A. I did not intend to.''

He further testified that cut-over lands in 1912 generally sold from fifty cents to one dollar per acre. The lands were hardly worth paying taxes on. Two-thirds of the lands was slashy creek bottoms, unfit for cultivation.

Cartier testified as follows:

''Q. You paid Mr. Hengstler for his interest in the land and timber out of what you got for the timber, and

you and Rath got the land? A. That is the way it is
—we got the land. Q. Did you tell Mr. Hengstler that
you were making these different conveyances, and that
you were paying him one-third of what you got out of
the timber, and that you and Rath had gotten the land
for nothing? A. To the best of my recollection I did
after he received his money, $20,000, I told him that the
land did not go, and asked him if he cared, and he says,
'No, I am satisfied, I got an excess profit, and I am satis-
fied.' Q. Why didn't you tell him that beforehand?
A. I had the option to do as I pleased. Q. You were
all partners? A. No sir. Q. You felt that you had a per-
fect right to sell his land and timber and pay him for
what you got out of the timber, and then not disclose the
facts to him? A. When he gave me the option, I could
do as I pleased as long as he got his money. Q. When
he gave you the option, you did not have any idea of sell-
ing the timber to Grayson? A. There had been some
negotiations, but nothing definite. Q. There was so
little chance that you did not even mention it to him?
A. Might have, but I don't remember. Q. After it
was all done and you had sold his interest in the land and
conveyed it around so you and Rath got all of the land
and paid him out of his interest in the timber on his own
land, then you told him that you done that? A. I
think I did. Q. Why did you? A. To give him his
interest in the land if he wanted to assume the liability.
Q. You wanted him to have the land if he wanted to
assume the liability? A. Yes sir. Q. What liability
was there to assume? A. To care for the land for ten
years, which was covered by the timber deed, and take
care of the cost, pay the taxes. Q. What has it cost to
care for this land which was off of the market? A.
Taxes on the land and the incidental expenses run up
pretty close to $5,000.''

It is unnecessary to decide, and we do not decide,
whether the lands, including the 3,000 acres purchased in
the names of appellee, Cartier and Rath, and the 1,000
acres purchased in the names of Cartier and Rath, were

all purchased as partnership lands or under agreement
for joint adventure. Nor is it necessary to decide
whether Cartier and Rath defrauded the appellee in the
manner in which they obtained the title to his lands.
For, if it be conceded that Cartier and Rath perpetrated
a fraud upon the appellee in the manner alleged in the
complaint, nevertheless it is proved by a preponderance
of the evidence, above set forth, that appellee had knowl-
edge of the fraud soon after the documents were executed
consummating the alleged fraudulent transaction of
which he complained. The testimony of Tate and Cartier
shows that he had such knowledge. Tate testified that
appellee had visited the lands in May, 1912, the month
before they were sold to Gaughan, and had ascertained
their value, and he and Cartier both testified that they
informed appellee of the facts concerning the sale of the
timber on the lands to Grayson. We are convinced, from
the above testimony, that appellee had full knowledge of
the facts soon after they occurred, which he now claims
constituted deceit and fraud on the part of Cartier and
Rath, and which resulted in depriving him of his interest
in all the lands in controversy. Such being the case,
appellee and cross-appellant is barred from maintain-
ing this action by the three-year statute of limitation,
and also by laches.

In *McGaughey* v. *Brown,* 46 Ark. 25, we held (quot-
ing syllabus) : ''Fraud in obtaining title to property will
not suspend the operation of the statute of limitations
against an action to set aside the title any longer than it
is concealed from the knowledge of the plaintiff.'' See
also *McNeely* v. *Terry,* 61 Ark. 527; *Salinger* v. *Black,*
68 Ark. 449; *Meier* v. *Hart,* 143 Ark. 539; 2 Wood on
Limitations, p. 1381, § 276.

The statute of limitations was properly pleaded by
the appellants, and it must avail in bar of appellee's
action. Appellee and cross-appellant is also barred by
laches. He is seeking affirmative relief in a court of
chancery. Inasmuch as fraud renders a transaction
voidable at the election of the person defrauded, the law

requires that the exercise of this election shall be in a reasonable time after the discovery of the fraud. "A party who sets up a fraudulent misrepresentation of fact as a ground of relief or defense must not be guilty of laches." Smith on Law of Frauds, p. 269, § 249. See *Davis* v. *Harrell,* 101 Ark. 230; *Board of Levee Inspectors of Chicot County* v. *Southwestern Land & Timber Co.,* 112 Ark. 467, and numerous other cases in 2 Crawford's Digest, p. 1875, "Laches and Stale Demands."

The testimony set out above shows that appellee and cross-appellant is guilty of laches. The court erred in its decree, and the same is therefore reversed, and the cause will be remanded with directions that the chancery court enter a decree dismissing appellee's complaint.