NEAL *v.* STUCKEY.

4-6427                                   155 S. W. 2d 683

Opinion delivered October 27, 1941.

1120

*Bruce Ivy, Myron T. Nailling, Horace Sloan* and *Frank Sloan,* for appellant.

*J. G. Waskom,* for appellee.

GREENHAW, J. On March 12, 1936, the appellees filed suit in the chancery court for the Osceola district of Mississippi county against the appellant, alleging that they were the owners in fee simple of that part of the northwest quarter of section 19, township 12 north, range 8 east, lying south of the left-hand chute of Little River, containing 21 acres, more or less, deraigning title thereto as follows: the Chicago Mill & Lumber Company of Illinois obtained title to said land in 1911. It defaulted in the payment of the 1921 assessment due Drainage District No. 17, resulting in a tax foreclosure sale and conveyance of the land to the drainage district. The company also permitted the land to be sold to the state for the nonpayment of the 1920 general taxes. On May 8, 1924, the state issued its redemption deed to W. R. Payne; and on May 19, 1924, Drainage District No. 17 executed its quitclaim deed for the land to W. R. Payne. W. R. Payne executed his quitclaim deed to the appellees on January 9, 1936.

They further alleged that the land was cleared and in cultivation; that the plaintiffs came into peaceable possession thereof early in the year 1933 and continued therein until February 15, 1936, when the appellant

entered upon the land and has continuously trespassed thereon and will continue to do so; that the defendant had no claim to the land and his trespasses would result in irreparable injury; that he was insolvent and relief by damages would be inadequate, and that he should be restrained from such trespassing. The plaintiff prayed for a temporary injunction to be followed by a permanent injunction against such trespasses. On March 16, 1936, the chancellor granted the temporary injunction prayed for.

The appellant filed his answer and cross-complaint, denying the allegations in the complaint, and by way of cross-complaint alleged a number of conveyances by which he attempted to establish title in himself, and alleged that the state tax deed and the drainage district deed to Payne were merely tax redemptions; that he and his predecessors had paid the taxes on the land for more than 20 years and that he was the owner of the land and was entitled to the immediate possession thereof, and asked that the injunction be dissolved and the court award him possession of the land, together with damages. The appellant filed an amendment to his answer and supplement to his cross-complaint on the 7th day of May, 1938, alleging that since the filing of his original cross-complaint the Paepcke Corporation, formerly named the Chicago Mill & Lumber Company, conveyed the land in controversy to the appellant on February 2, 1938.

Appellant further alleged that the drainage tax foreclosure and the forfeiture of the land to the state for nonpayment of the 1920 taxes were both void, assigning various reasons therefor, and that W. R. Payne personally never purchased the land from the drainage district nor redeemed the land from the state of Arkansas, but that the American Trust Company, which held a mortgage, paid the amounts necessary to obtain these deeds, which were issued in the name of W. R. Payne. The appellant prayed in his supplemental cross-complaint that the complaint of the appellees be dismissed for want of equity, that the injunction be dissolved, that the court declare the tax sales to the drainage district and the state of Ar-

kansas null and void, and that said sales be canceled as a cloud on the title of the appellant, and that he be awarded a writ of possession of said lands, together with judgment for rents, less taxes and drainage assessments paid by the appellees.

It is undisputed that the Chicago Mill and Lumber Company owned that part of the northwest quarter lying south of the left-hand chute of Little River when it was sold to the state and to Drainage District No. 17. The taxes on this land, together with other land in the northwest quarter, were not paid for the year 1920, and all of said northwest quarter was forfeited and sold to the state of Arkansas. The drainage district assessments for 1921 were not paid, and in a foreclosure proceeding the land in controversy was sold to Drainage District No. 17. The American Trust Company had a mortgage on that part of the northwest quarter which lies north of the left-hand chute of Little River. The mortgage was subject to foreclosure, and the American Trust Company paid for a redemption deed from the state of Arkansas, which was executed in the name of W. R. Payne, covering not only the land embraced in its mortgage north of the left-hand chute of the river, but the land in controversy south of the left-hand chute of Little River. The American Trust Company paid to Drainage District No. 17 the amount necessary to obtain a deed not only to the land embraced in its mortgage north of the river, but also the land in controversy south of the river, and a quitclaim deed was executed by the drainage district to W. R. Payne, said state deed and drainage district deed both being executed in May, 1924. Thereafter the American Trust Company obtained title through foreclosure proceedings to that part of the northwest quarter lying north of the left-hand chute of Little River, and sold and conveyed it, taking two mortgages from the purchasers, one for $10,000 and one for $7,000. The $10,000 mortgage was sold and assigned to the Chester Savings Bank of Vermont.

The American Trust Company later became insolvent and its affairs were liquidated through the State Banking Department. The purchasers of the land north

of the river, being unable to pay the mortgage indebtedness, conveyed their interest in the land north of the river to the State Bank Commissioner, who later, for a small consideration, conveyed the land north of the river to the Chester Savings Bank. In 1931, the Chester Savings Bank rented its said land north of the left-hand chute of Little River to the appellant, C. S. Neal, who moved on this farm and operated it as a tenant until 1934. In 1934, the appellant, C. S. Neal, and the Chester Savings Bank entered into an agreement whereby the Chester Savings Bank agreed to convey its land to the appellant, the written agreement specifically providing that it was to convey all of the land in the northwest quarter north of the left-hand chute of Little River, containing 160 acres, more or less. On May 13, 1938, the bank executed its deed to the appellant, to all of that part of the northwest quarter lying north of the left-hand chute of Little River, containing 160 acres, more or less. During all of this time the appellant had no color of title whatsoever to that part of the northwest quarter lying south of the left-hand chute of Little River, containing approximately 21 acres, being the land in controversy.

After this suit had been pending for practically two years the appellant obtained a quitclaim deed dated February 2, 1938, from the Paepcke Corporation, the successor to the Chicago Mill & Lumber Company. It is apparently upon this deed that the appellant finally based his claim to the land in controversy south of the left-hand chute of Little River, since he never lived upon the land in controversy nor claimed any interest in it until a short time before this suit was filed, and the deed he obtained from the Chester Savings Bank to the land upon which he had been living for a number of years, specifically conveyed only all of that part of the northwest quarter north of the left-hand chute of Little River.

The appellees, on the other hand, obtained a deed from the Missouri State Life Insurance Company in January, 1933, conveying to them its land in the southwest quarter of section 19, adjacent to the northwest quarter of said section. At the time the appellees purchased the land from the Missouri State Life Insurance Company

they thought that the land they were purchasing extended to the left-hand chute of Little River. Appellee, J. G. Stuckey, testified that the agent for the insurance company told him when the deal was made that the lands belonging to the insurance company extended to the river, and the agent who sold them the land testified that he thought the lands of the insurance company which were being sold to the appellees extended up to the left-hand chute of Little River. It was further in evidence that in 1926 the Missouri State Life Insurance Company rented its lands in the southwest quarter to U. S. Holiman during the year 1926, and that that tenant believed the lands of the insurance company which he had rented extended north to the left-hand chute of the river and he did a little clearing on that part of the northwest quarter lying south of the left-hand chute of Little River during that year. Holiman did not rent the lands for the year 1927, but again became a tenant of the insurance company for the year 1928, and continued as a tenant without interruption through the year 1932. From the year 1928 through the year 1932, he continued to clear land on that part of the northwest quarter lying south of the left-hand chute of Little River, believing it to be the property of the insurance company for which he was tenant. At the time Holiman first started to clear land in the northwest quarter south of the left-hand chute of Little River it was all in timber, and he continued to clear some each year, placing it in cultivation. The appellees, after they purchased the lands belonging to the insurance company early in 1933, continued to clear and improve the land in controversy, thinking it was a part of the land which they had purchased from the insurance company, until all of said land in controversy had been cleared and placed in a state of cultivation. The land, after it was cleared, was valuable land which would produce a bale of cotton to the acre.

Appellant admitted in his testimony that he had a conversation with J. G. Stuckey, one of the appellees, in the fall of 1932, when he was discussing the possible purchase of the land north of the river from the Chester Savings Bank. Upon being interrogated as to whether

they discussed the land now in controversy, south of the river, he answered: "No, sir, we didn't discuss this land being over there at that time. We figured the Holiman boys were on this Missouri State Life place at that time." Therefore, according to appellant's own testimony, in the fall of 1932, he himself thought, as did the appellees, that the land now in controversy actually belonged to the Missouri State Life Insurance Company. Within a very short time after this conference the appellees purchased the insurance company's land, actually believing its deed covered all of the land south of the left-hand chute of Little River. Early in 1936, the appellant attempted to exercise control over the land in controversy, and actually did some plowing thereon, and the acts of the appellant in this regard resulted in the suit being filed against him by the appellees. Prior to filing suit in March, 1936, the appellees obtained a quitclaim deed to the land in controversy from W. R. Payne, in whose name the state redemption deed and the drainage district quitclaim deed were executed in May, 1924.

The evidence further showed that from the time the land in controversy forfeited to the state for nonpayment of taxes in the year 1920 and was foreclosed by the drainage district for nonpayment of 1921 assessments, the Chicago Mill & Lumber Company, the owner thereof at that time, never thereafter paid any taxes on the land in controversy, and as far as the record is concerned never attempted thereafter to exercise any control whatsoever over said land.

There were several witnesses who testified in this case, and numerous exhibits were introduced in evidence. The court found the issues in favor of the appellees, and that title to said land was vested in them, and canceled the deed from the Paepcke Corporation to the appellant as a cloud on appellees' title; the temporary restraining order was made permanent and appellant, C. S. Neal, his agents, servants and employees were permanently restrained and enjoined from trespassing upon the land in controversy or in anywise interfering with appellees' possession thereof. From this decree the appellant has appealed to this court.

We have reached the conclusion that the decree of the chancery court should be affirmed. Under the facts in this case we think the appellant and his grantor, the Paepcke Corporation, successor to the Chicago Mill & Lumber Company, were guilty of laches and by reason thereof will not be permitted to assert ownership in the land in controversy or to interfere with the possession of the appellees. After the land in controversy forfeited to the state for nonpayment of taxes and was sold to the drainage district for the nonpayment of taxes in 1921, the Chicago Mill & Lumber Company and its successor, the Paepcke Corporation, as far as this record is concerned, absolutely abandoned any interest whatsoever in said land, never paid any taxes thereon, was not in possession thereof, and neither directly nor indirectly attempted to exercise any ownership thereof until the Paepcke Corporation executed its quitclaim deed to the appellant on January 2, 1938, practically two years after this suit had been filed by the appellees. Certainly the Chicago Mill & Lumber Company and the Paepcke Corporation, after showing no interest whatsoever in said lands and paying no taxes thereon for a period of 18 years, would be barred by laches from interfering with appellees' possession and alleged ownership of said lands. The appellant, C. S. Neal, the grantee in the quitclaim deed from the Paepcke Corporation to the land in question, would certainly have no more rights therein than his grantor.

According to the evidence in this case the appellant, Neal, lived just north of the river, was in close proximity to and could see the improvements which were being made on the lands in controversy immediately south of the river from the time he moved on the land north of the river in 1931 until the appellees purchased land south of the river in 1933 and assumed ownership and control of the land in controversy. He continued to live on his land north of the river while the appellees were improving the land in controversy in 1933 and thereafter. Although he saw and knew about the improvements that the appellees were continuing to make in clearing and placing said land in cultivation, he made no protest. This

is also true after he purchased the land north of the river in 1934. The proof shows that he remained silent, attempting to exercise no ownership or control over the land in controversy, until a short time before this suit was filed in March, 1936. He and his grantor, the Paepcke Corporation, permitted this land, which was in an uncleared and undeveloped condition, to be cleared and placed in a high state of cultivation thereby rendering the land much more valuable. Under all of these facts and circumstances we think appellant was guilty of laches and he will not be permitted to assert ownership to the land in controversy. The same is true of his grantor, the Paepcke Corporation.

The case of *Horn* v. *Hull,* 169 Ark. 463, 275 S. W. 905, was a case in which the doctrine of laches was invoked in a land matter. In that case this court, among other things, said:

"The doctrine of laches which is a species of estoppel rests upon the principle that, if one maintains silence when in conscience he ought to speak, equity will bar him from speaking when in conscience he ought to remain silent. *Gibson* v. *Herriott,* 55 Ark. 85, 175 S. W. 589, 29 Am. St. Rep. 17; *Jackson* v. *Becktold Printing & Book Mfg. Co.,* 86 Ark. 591, 112 S. W. 161, 20 L. R. A., N. S., 454; *Davis* v. *Harrell,* 101 Ark. 230, 142 S. W. 156; *Brownfield* v. *Bookout,* 147 Ark. 555, 228 S. W. 51; and *Stewart Oil Co.* v. *Bryant,* 153 Ark. 432, 243 S. W. 811.

"Under these and many other decisions of this court which might be cited, the general rule of the doctrine of laches is that equity may in the exercise of its own inherent powers refuse relief where it is sought after undue and unexplained delay, and where injustice would be done in the particular case by granting the particular relief asked. Each case must be governed by its own facts; what would be an unreasonable delay in one case might not be in another. We deem it sufficient to say that the delay in this case extended over a period of nearly three years and during a part of this time, oil wells were being drilled in that territory. Appellants could not wait until the drilling of these wells on the lands in question and in that vicinity had caused them to

1128

increase greatly in value before they brought this suit. They could not stand by and see other parties in good faith expending large sums of money drilling oil and gas wells and wait until the property was greatly enhanced in value thereby before asserting their rights. This would be contrary to the plainest principles of equity and natural justice."

Counsel for appellant contend that laches and estoppel can only be invoked as a defense, and that they do not apply in this case. We cannot agree that laches is not applicable here. The appellant, both in his original cross-complaint and his supplemental cross-complaint, asked for affirmative relief. Therefore, the appellees had the right to invoke the doctrines of laches and estoppel as defenses to appellant's contention.

The decree of the chancery court is, therefore, affirmed.