PAGE *v.* WOODSON.

4.8097                                        200 S. W. 2d 768

Opinion delivered March 17, 1947.

Rehearing denied April 21, 1947.

*Chas. B. Thweatt, Fred A. Isgrig* and *H. B. Stubble-field,* for appellant.

*E. R. Parham,* for appellee.

Holt, J.   October 6, 1945, Earl Page brought suit against his wife, Minnie A. Page, for divorce.   He attached to, and made a part of his complaint, a complete written property settlement made between him and his wife on October 5, 1945, which was duly signed by both parties.   Summons was duly served on Minnie A. Page on the date the suit was filed and on this summons, she noted her entry of appearance and waiver.   A decree of divorce and the confirmation of the property settlement was rendered by the court October 9, 1945.   The property settlement was embodied in and made a part of the decree.

Subsequent to the entry of this decree, on January 10, 1946, Earl Page died testate without surviving issue. By the terms of his will, he gave all the property that he then owned to appellee, Maude Woodson, a sister, and to others.

On January 16, 1946, less than a week after Mr. Page's death, appellant, Minnie A. Page, filed suit against appellees in which she sought to set aside the property settlement on the ground that she entered into the settlement under duress, consisting of threats by Mr. Page to take her life if she contested the divorce action or refused to execute the property settlement; that the duress continued to exist until shortly before Mr. Page's death, and that he had agreed to remarry her.

On February 11, 1946, Mrs. Page filed another suit in which she sought to vacate the decree of divorce on the grounds of fraud and duress, and in addition, alleged that she had a meritorious defense to the divorce action which she was prevented from exercising by threats of Mr. Page, and that Mr. Page had no grounds for divorce.

Appellees interposed a general denial to the complaints in both actions; and the two causes, after having been consolidated, proceeded to trial.   After a prolonged and patient hearing, the chancellor found the issues in favor of appellees and dismissed both complaints for want of equity.

This appeal followed.

The record in this case is voluminous, containing approximately 800 pages. Much of the testimony is conflicting and some incompetent.

While the cause comes here for trial *de novo,* under our well settled rule, we must affirm unless we can say that the findings and decree of the trial court were against the preponderance of the evidence.

We think no useful purpose would be served in an attempt to detail and analyze the testimony to determine where the preponderance lies. It suffices to say that, after reviewing the evidence and giving consideration to what we deem to be the competent testimony, as the trial court no doubt did, we are unable to say that the findings of the chancellor, and the decree based on those findings, are against the preponderance of the testimony.

The trial court heard much of the evidence presented direct from the witness stand and was therefore in a much better position to determine its truth and where the preponderance lay, than we could possibly be.

Earl Page had been a cripple since birth. His lower limbs were withered and drawn up so as to make them useless. He moved about by the use of his arms propelling himself on two wooden blocks, which he grasped in his hands. At times, he used a wheel chair.

Through strenuous effort and determination, and with the help of appellant, whom he had married approximately twenty years prior to his death, he had accumulated substantial property and acquired a prominent place in State politics, having held state office for approximately sixteen years. He truly was a typical example of a man who, under the severest physical handicaps and hardships, by determination and will power, lifted himself ''by his own boot straps.''

Mrs. Page testified that her husband threatened her with a pistol and that he would kill her if she refused to accede to a divorce and property settlement. She had had business experience and worked along with her husband.

Before appellant could prevail, in the present case, it devolved upon her to establish, by a preponderance of all the testimony, that the decree of divorce, and the property settlement which was embodied in that decree, were obtained through duress or fraud and this, as indicated, we think she has failed to do. During negotiations leading up to the property settlement which does not appear to be unfair or inequitable, appellant consulted able counsel as to her property rights, and this attorney, not of present counsel, testified that he advised her fully relative thereto, that the contract was carefully reviewed and certain changes which she desired were made, and as to whether Mrs. Page appeared to be acting under threat or duress from her husband at the time, the attorney testified: "I did not believe, with the energy, push and intelligence that Mrs. Page had, that anybody could make —could force—her to do anything she didn't want to do."

There is still another reason why the appellant cannot prevail in this action, and that is, that she has been estopped by conduct amounting to laches.

It appears certain from the evidence that the duress claimed by appellant grew out of alleged threats of Earl Page to take her life prior to and leading up to the divorce decree and property settlement.

Immediately following the divorce decree, Mr. Page went to Yell county where he remained until December 13th, when he suffered a heart attack. He was in a Little Rock hospital from December 14th to December 24th, and soon after Christmas, he went to Carlsbad, New Mexico, where he remained until his sudden death January 10, 1946.

We find no evidence of any duress or threats subsequent to the property settlement and divorce decree. In these circumstances, Mrs. Page waited more than three months after the decree of divorce, and for approximately a week following Mr. Page's death, and when he could no longer speak for himself, before bringing the present suit. Certain it is that, for practically the entire time subse-

quent to the divorce until Mr. Page died, Mrs. Page was not threatened by her husband and was beyond the range of possible physical violence. It was during this time that the law required prompt action on her part, and this she failed to take.

Under the heading of "Duress and Undue Influence" in 17 Am. Jur., p. 902, § 25, the text writer says: "*Generally.*—A contract entered into under duress being, as has been seen, generally considered not void, but merely voidable, it is, like other voidable contracts, valid until it is avoided by the person entitled to avoid it. A contract entered into under duress may be ratified after the duress is removed. Such ratification results if the party entering into the contract under duress accepts the benefits growing out of it or remains silent or acquiesces in the contract for any considerable length of time after opportunity is afforded to avoid it or have it annulled. This is particularly true where such transaction has operated to alter legal rights by transferring them to another. While a contract voidable for duress may be ratified, either by express consent, or by conduct inconsistent with any other hypothesis than that of approval, still the intention to ratify is an essential element, and is at the foundation of the doctrine of waiver or ratification. It is essential that the influence of the duress must be removed before conduct becomes voluntary. The fact that the act which was done under duress is not repudiated for a long time will not amount to a ratification where it appears that at no time during such period of time was the duress removed."

"The law requires promptness in repudiating an agreement alleged to have been induced by duress." *Maisel et al.* v. *Sigman et al.*, 205 N. Y. S. 807, 123 Misc. 714.

No certain or definite period of time is necessary to establish laches. Each case must depend on its own peculiar facts. On this question, we find in 19 Am. Jur., p. 345, § 499, this language: "The period establishing laches is not 'one which can be measured out in days and months as though it were a statute of limitations.' The determi-

nation of the question as to laches *vel non* proceeds in the light of the circumstances of the case. What might be inexcusable delay in one case would not be inconsistent with diligence in another."

In *Bauer, Executor,* v. *Brown,* 129 Ark. 125, 194 S. W. 1025, this court said: "It is well established, and this court is committed to the principle that a party seeking to cancel a decree of divorce for fraud, irregularity or deceit must proceed with diligence after discovery of the fraud. Such relief will not be granted if the complaining party is guilty of laches or unreasonable delay in seeking the remedy," and in *Neal* v. *Stuckey,* 202 Ark. 1119, 155 S. W. 2d 683, we find this language:

"The doctrine of laches which is a species of estoppel rests upon the principle that, if one maintains silence when in conscience he ought to speak, equity will bar him from speaking when in conscience he ought to remain silent. (Citing cases.) Under these and many other decisions of this court which might be cited, the general rule of the doctrine of laches is that equity may in the exercise of its own inherent powers refuse relief where it is sought after undue and unexplained delay, and where injustice would be done in the particular case by granting the particular relief asked. Each case must be governed by its own facts; what would be an unreasonable delay in one case might not be in another."

In *Cartier* v. *Hengstler,* 166 Ark. 303, 266 S. W. 304, this court said: "Appellee and cross-appellant is also barred by laches. He is seeking affirmative relief in a court of chancery. Inasmuch as fraud renders a transaction voidable at the election of the person defrauded, the law requires that the exercise of this election shall be in a reasonable time after the discovery of the fraud. 'A party who sets up a fraudulent misrepresentation of fact as a ground of relief or defense must not be guilty of laches.' "

We think under these well settled rules of law, and on the facts presented here, that the decree was in all things correct, and accordingly is affirmed.